## HOPE v. BARHAM.
### No. 790.

District Court, W. D. Louisiana, Shreveport Division.

Aug. 5, 1939.

Harry V. Booth and Leonard L. Lockard, both of Shreveport, La., for plaintiff.

Herold, Cousin & Herold, of Shreveport, La., for defendant.

PORTERIE, District Judge.

Plaintiff alleges that prior to August, 1937, she was the owner in fee of 580 acres of land in Webster Parish, Louisiana, in the midst of the new Cotton Valley oil field; and that prior to the date mentioned she had granted two oil and gas leases, one to J. G. Sellwood and another to the Hunt Oil Company, under which leases she was to receive, as part consideration, a bonus or "oil payment", of $75,-000 in the first case and $50,000 in the second case, payable contingently out of seven sixty-fourths of the oil first taken, saved and sold from the leased premises by the two lessees or their assignees.

Then, plaintiff alleges that on August 19, 1937, she sold to the defendant, for $400 per acre, a one-sixteenth interest in the minerals in this tract of land, subject to the above oil and gas leases; and that, without her knowledge or consent, there was included in the mineral sale a conveyance not only of the one-sixteenth "royalty" inhering in the mineral purchase but also one-sixteenth of the additional "oil payment"; that she also executed a second deed, identical in terms with the one just mentioned, and dated August 20, 1937.

For this reason, she sues to annul the contract on the ground of fraud; and in the alternative, for reformation, so as to strike out the conveyance of the oil payment; and, in the second alternative, for a money judgment for $950, which she claims was wrongfully retained by defendant from the sales price.

There is no evidence upon the latter point, so that the case resolves itself into the right of Mrs. Hope

(a) to rescind for fraud, or

(b) to reform for error.

The plaintiff alleged that the actual transaction was consummated in the Continental-American Bank & Trust Co. of Shreveport, Louisiana, at which time she had in her possession only her menu glasses, designed solely for reading lines and not adapted to reading printed documents; that she asked directly of the defendant what the documents were and was assured by him and his attorney that they were straight mineral deeds conformable in all respects to sales of like kind made in Louisiana daily, whereupon she signed same in ignorance that defendant had inserted in each instance a clause containing a one-sixteenth of her said oil payment.

The plaintiff attaches some importance to the uniqueness of the clause "and 1/16 of any and all money payments out of oil due or to become due under the terms of said leases" in contracts for minerals.

First, one must consider that relatively few mineral contracts have the provision, in addition to the regulation royalty of one-eighth, that payment from a certain proportion of the oil is to be made until a certain amount of money is received from this surplus oil. It is only when this type of rare contract is assigned (and this assignment, in turn, might be rare) that the question arises whether a like portion of the additional oil payment must run, with or without mention, with the sale of a portion of the one-eighth royalty.

Even though a contract be unique, where there is a meeting of the minds and the instrument is written, it is as legal a

contract as one similar to thousands of others.

Since in the instant contract the mention of the additional oil payment is specifically made, the Court feels it is not called upon to pass upon the legal point, urged by defendants, that the overriding royalty would have passed as part of the mineral purchase, *even without mention.*

■ The Court could well ·have sustained the motion to dismiss herein, because one may not rescind or reform a written instrument which was prepared in advance for signature, and submitted for reading. The failure of the party to read a written contract is such negligence as to preclude recovery. Allen, West & Bush v. Whetstone, 35 La.Ann. 846; Murphy v. Hussey, 117 La. 390, 41 So. 692.

The Supreme Court of the United States in Upton v. Tribilcock, 91 U.S. 45, 50, 23 L.Ed. 203, said: "It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission."

See also Note 83, p. 52 of Williston on Contracts, Vol. 1.

The Court, however, overruled the motion to dismiss because it thought the plaintiff should be heard in full and unrestrictedly, and, also, the Court felt the defendant himself and the parties involved in the transaction would not desire to win on a technicality in the face of the allegation of fraud.

The Court believes that the written contract involved should be reproduced in this opinion in full, as this will help very much to understand the case and the findings of the Court:

"State of Louisiana:
"Parish of Caddo:

"Know all men by these presents:

"That Mrs. Eleanor M. Hope, a widow, who declared that she does by these presents, grant, bargain, sell, convey and deliver, with full guarantee of title and with complete transfer and subrogation of all rights and actions of warranty against all former proprietors of the property herein conveyed unto George B. Barham, husband of Elnore McCausland, residents of Caddo Parish, Louisiana, and assigns, the following described property, to-wit: One-Sixteenth (1/16) of the oil, gas and other minerals, in and under and that may be produced from the following described lands situated in the Parish of Webster, Louisiana:

"S½ of SW¼ of SW¼. Sec. 12; NW¼ of NW¼, E½ of SW¼ and SW¼ of SE¼. Sec. 13; W½ of NW¼, NE¼ of NW¼, NW¼ of NE¼ and S½ of S½, Sec. 24; W½ of NW¼, Sec. 25, all in Twp. 21 N. Rng. 10 W., containing· 580 acres, more or less.

"It is understood between the parties hereto that this sale is made subject to an oil and gas lease executed in favor of Hunt Oil Company on the 20th day of March, 1937, and also subject to an oil and gas lease executed in favor of J. G. Sellwood on the 30th day of December, 1936, made a part hereof by reference, but covers and includes ⅟₁₆ of all the oil royalties and gas rentals or royalties due and to become due under the terms of said lease, and a like interest in all money rentals that may be hereafter paid in order to keep said leases in effect without drilling, *and ⅟₁₆ of any and all money payments out of oil due or to become due under the terms of said leases.*

"This sale is made for the consideration of $14,500.00 cash in hand paid, the receipt of which is hereby acknowledged.

"In Witness Whereof, this instrument is signed on this the 19th day of August, 1937.
"J. H. Lemond          .Eleanor M. Hope
"J. P. D'Artois

"J. H. Lemond
"J. P. D'Artois          Geo. B. Barham"
(Italics ours)

The evidence discloses that the above document was a wholly typewritten one— type of uniform size.

There is another contract between the same parties, identical to the one above, ·for the other sixteenth interest of plaintiff, with but one difference: the date is the 20th and not the 19th.

■ I. Was fraud perpetrated upon the plaintiff?

(a) There is nothing about the physical make-up of the document that could help to perpetrate a fraud on the plaintiff. It is short, very short; may be read understandingly in one minute. It being all typewritten, and uniform in letter size, there

could be no reason to read one part of it and not another.

(b) The plaintiff is an intelligent lady, capable of reading and writing the English language.

(c) Mr. R. McL. Jeter, vice-president of the Continental-American Bank & Trust Co., testified that the plaintiff had the papers at least an hour, sitting at a desk in the lobby of the bank, reading and looking over them. The bank lobby is accepted as having been the meeting place of all parties concerned for the signing of the agreement and for the payment of the price. Mr. Jeter was vigorously and closely cross-examined and satisfied the Court as to his recollection of the incident.

(d) The fact that plaintiff had full opportunity to read, and did read, the short contract, as above testified to by Mr. Jeter, is further attested by Mr. Patrick D'Artois, Attorney of Shreveport, by the defendant, Barham, and by Mr. L. L. Prock, for sixteen years an employee of the Ohio Oil Company.

(e) Mr. Patrick D'Artois, a reputable member of the Shreveport bar, testified as to the plaintiff knowing fully what she was selling, by having read the documents, or better, of even knowing what the bargain was before the contracts were typewritten and the meeting had at the bank lobby for its completion.

(f) D'Artois testified as to the two identical contracts in detail. He showed further that the plaintiff negotiated a third contract of similar character and identical conditions a month later through him. An important point of his testimony was that the plaintiff was offered a cancellation of the sale in the third contract and she finally refused.

(g) The defendant testified that he had been willing to pay $400 per acre without royalty payments some time before but, at time of this purchase, Cotton Valley prospects, as reported to him, were down.

(h) There was not a single producing well on the Hope property in August, 1937, the time of sale; the first well actually on the property was brought in during January, 1938. So, in truth, even the Bodcau production stratum was not a certainty. This is testified to generally and accepted by both sides.

(i) The Hopes, wife and husband, owned the property for twenty-five years before this sale of minerals in August, 1937.

No point can be made that the potentiality of this property should not have been well known to Mrs. Hope.

(j) Mr. G. W. Cole, offered as an expert for plaintiff, but whose qualification as such was much discounted on cross-examination, testified that at time of the sale the Hope property was worth $1,000 per acre. The Court must admit, however, that his evidence is all based on what he sees now and not what was in August, 1937. Mr. Cole closes his evidence with the following:

"The Court: How much did you ever pay for your property per acre in all of your Cotton Valley transactions?

"The Witness: I don't think I ever paid over a hundred dollars. You see, I bought mine in the shallow stuff back yonder when it first came in. I haven't bought or spent anything since they got the deep stuff."

The "deep stuff" came in after this sale of minerals in 1937; it came in 1938.

II. Evidence as to want of consideration at time of contract to show fraud.

(a) Prospects outside of the proved Bodcau sands of the Cotton Valley area at time of sale of minerals were not promising.

(1) Mr. C. L. Moody, head of the geological department of the Ohio Oil Company for the Cotton Valley area, within which area land at issue herein is included, testified that he refused for the Ohio Oil Company the very contract, price the same and oil payments included, which the defendant later accepted from the plaintiff. He testified that the Gray property in the same area had been bought by the Ohio, just earlier in the year 1937, at the same price of $400 per acre, including the oil payments.

Mr. Moody unqualifiedly testified that on the 19th day of August, 1937, the oil property herein, prorated oil payments included, was not worth more than the $400 per acre paid by defendant. His testimony very logically disclosed that the Bodcau sand was the only real source of probable oil output at the time, and its exploitation would leave one without profit, at $400 per acre; that the Holloway and other sands, which subsequently developed, were contra-indicated at the time, because the Ohio Oil Company Coyle-Cox Unit No. 1 well and the Magnolia-Cox Section 23 well, completed August 2nd and August 6th, re-

spectively, year 1937, Cotton Valley section and near the land involved herein, showed no sand in the Holloway section. The probable Bodcau sand production was always there; the $400 per acre was for that, with no profit. Parenthetically, the Court may as well say right here that it is of the opinion that the defendant made the bargain just because of the hope there might be for other sands; and if the hope turned into reality, there would be substantial profit.

(2) Dr. A. F. Crider, expert geologist, for the plaintiff, on the other hand, testified that the plaintiff's property was promising about the time of her sale to Barham, August 1937. He says:

"A. Well, at the time in 1937 there had not been so many wells drilled in that part of the territory but the indications were that the entire tract would be productive, as extending the lines from the wells on the south to the wells on the north.

"Q. That it was entirely productive? A. Yes, sir.

"Q. From what horizon? A. Well, from the Holloway sand on down to and including the Davis sand."

On cross-examination, however, he does admit cause for alarm to the investor:

"Q. We are using our hind sight now, are we not, Doctor? Put yourself in the position that a consulting geologist was in in August 1937, finding this abrupt dip of four hundred feet and not having found any oil in the sand at any such dip as that in the structure, was it not rather alarming to those spending large sums of money in the hope that the field would extend for a long distance? A. We were surprised when the production extended down as far as it did, but it still continued to produce much farther down than we had anticipated.

"Q. But you had not anticipated it would produce that far down at that time—looking forward instead of backwards? A. We were comparing Cotton Valley to all of the other producing fields over northern Louisiana and at that time no other field had produced down as far as the Cotton Valley field had and we then, of course, wondered how much farther down the dip the oil would continue to be produced."

Also, he corroborates defendant's expert on the point that the Bodcau sand was the only probably productive one at time of sale:

"Q. Doctor, you found nothing in the records that would induce you to qualify the statement that you made this morning, have you, that in August 1937 there was no production whatever from the deeper sands on the Hope property? A. There was none at that time."

Mrs. Hope, the plaintiff herself, admits the prospect for her property, outside of the proved Bodcau sands, for which, in the main, she was paid the $400 per acre, was not promising. She testified, in part, as follows:

"The Court: Did you feel as a certainty that, as the future proved it to be, these money payments on these previous leases would mean anything? That is, would bring more than on the day you consummated this deal at the bank?

"The Witness: Did I think it would bring much?

"The Court: Yes, or did you realize it then in truth?

"The Witness: Well, they told me that I could have gotten more only that Cotton Valley was—what do you call it—going down."

(b) Legal clouds on title affecting value at time of contract.

It was proved that a previous lease on this property held by the Arkansas Natural Gas Company from the plaintiff cast a cloud on the title held by Sellwood and the Hunt Oil Company—through whom, of necessity, Barham was to hold. The defendant admitted it; the exhibit is on file of the existence of pending litigation in Webster parish wherein the older Arkansas lease on this property was seriously urged as being valid. Exhibits were also filed of public records to show that the plaintiff referred to such litigation by number and title of suit in transactions she had with others.

Mr. John T. Campbell, Clerk of Court of Webster Parish, said:

"Q. In August 1937 were there any leases outstanding on the Hope property on the records of Webster Parish besides the Sellwood lease and Hunt lease? A. Yes, sir."

* * *

"Q. On August 19, 1937, Mr. Campbell, was or was not the litigation still pending over the validity of the old B. B. Jones lease then held and defended by the Arkansas Natural Gas Company? A. It was pending at that time, yes, sir."

Geologically, there was a gamble; legally as to title, there was a gamble; the Bodcau sand oil production paid the $400 per acre without profit; the plaintiff took the sure end of the situation (the cash above ground), the defendant took the gamble—but the future proved to be in favor of the defendant. He had contracted for the possibilities of the future. They are his and the Court must allow them to him.

The retention by Mrs. Hope, the plaintiff herein, when she leased for minerals to the Hunt Oil Company and Sellwood of these overriding royalties in the way of cash payments in the sums of $50,000 and $75,000, respectively, out of the 7/64ths of the total oil produced, is the full proof of her faith in her property's potentiality. She chose later to sell that which she knew she had; it was clearly and frankly written; she should be bound.

The Court is of the opinion that the facts, as above summarized, and the applicable law do not sustain either fraud or error, as alleged by plaintiff. A clear preponderance of the evidence is in defendant's favor.

Judgment will be signed accordingly, dismissing action of plaintiff at her cost.