**WARREN PETROLEUM CORPORA-
TION, Appellant,**

v.

**J. W. GREEN CONTRACTORS, Appellee.**

No. 25334.

United States Court of Appeals
Fifth Circuit.

Oct. 10, 1969.

Rehearing Denied Dec. 18, 1969.

Herbert Boyland, Longview, Tex., for appellant.

Earl Sharp, Longview, Tex., for appellee.

Before COLEMAN and GODBOLD, Circuit Judges, and RUBIN, District Judge.

GODBOLD, Circuit Judge.

In this diversity action Warren seeks indemnity from Green for damages paid by Warren under a judgment entered against Warren in an earlier personal injury suit. The jury verdict was for Green. Warren appeals. We reverse.

Central to this case is the following indemnity provision of a contract between Warren and Green.

INDEMNIFICATION AND IN-SURANCE—Contractor [Green] indemnifies and agrees to hold Owner [Warren] harmless from any and all liability, claims, demands or judgments for damages resulting from injuries to or death of persons, including Contractor and Contractor's employees, or any injury to or destruction of the property of others, including the property of Contractor or that of Contractor's employees, or any damages or losses to the property of Owner while Contractor is performing the work, which arises out of or in connection with the activities of Contractor, Contractor's servants, agents and employees.

Sidney Elliott was injured at Warren's Gladewater, Texas, plant while there for the purpose of performing welding work for Warren, in connection with the lowering and rerouting of a pipeline. He filed suit against Warren for failure to furnish a safe place to work. Warren tendered defense of the suit to Green, relying on the indemnity agreement. Green refused to defend. The complaint in that case is not in the record, but the pretrial order in the present case says that Elliott alleged that when injured he was on the premises of Warren to perform work as a subcontractor. What purports to be a copy of the pretrial order in the Elliott-Warren case is in the present record as an unauthenticated attachment to a trial brief. Paragraph 4 of that preterial order is the following stipulation of fact:

4. That Plaintiff was performing such work as an agent for ~~under a sub-contract with~~ J. W. Green, who had a contract with the Defendant to perform certain work as requested by Defendant; that the work being performed by Plaintiff in this instance was covered under the contract between Defendant and J. W. Green. [Substitution in original.]

A jury trial resulted in a judgment in favor of Elliott. Warren again requested Green to take over the defense of the case and upon its refusal paid Elliott $12,750 in settlement. Warren then brought the present action against Green to recover the amount of its payment to Elliott and of its attorney's fees and other expenses incurred in defending against Elliott's suit.

Elliott had been employed by Warren as its only welder at its Gladewater plant. Warren terminated Elliott's employment. There was conflicting evidence concerning whether the termination was part of a reduction in work force. At that time Warren told Elliott it wanted to work out an arrangement whereby Elliott would purchase from Warren the truck and welding rig he had been using in his work and continue to do Warren's welding work on a contract basis. Elliott purchased the truck and equipment. Since company policy forbade Warren's contracting directly with its ex-employee, Warren talked with Elliott about his "working through" an independent contractor. Warren suggested the names of several contractors and took an active part in trying to help Elliott make arrangements to "get around" the company policy.

Elliott discussed the matter with one of the contractors named by Warren, but the contractor was not interested because already he had sufficient welders in his work force.[1] Elliott then approached Green, a partnership furnishing labor and equipment to the oil and gas industry. Green had a contract with Warren to furnish labor and equipment to Warren at its Tyler, Texas, plant. After discussion between Green and Elliott, and Green and Warren, the contract at issue in this case was signed by Warren and Green.

The contract, furnished by Warren, was a form document providing that Warren "may, but does not obligate it-

---

1. Warren also discussed with this contractor an arrangement for one of the terminated employees to "work through" him. Whether the person discussed was Elliott or another terminated employee is unclear.

self to, request [Green] to supply labor, supervision, expendable supplies, machinery, and tools necessary to accomplish certain work at or in conjunction with [the Gladewater plant]." Green was referred to as an independent contractor. Attached to the form was Green's list showing twenty different occupational categories of workmen that could be supplied, with a straight time rate and an overtime rate for each, and more than fifty types of equipment—automotive, tractors, heavy construction, painting, and numerous other types, some with and some without operators—and the hourly rental rate for each.

The contract required that "In furtherance of [Green's] indemnity" Green would maintain workmen's compensation insurance, employer's liability insurance, automotive liability insurance and public liability insurance, and "Such insurand shall apply to operations by Contractor or by any subcontractor or by anyone directly or indirectly employed by either of them."

The scheduled rate provided by the contract for a welder with field equipment was $6.00 per hour. Green and Elliott, whose dealings were oral, agreed that Green would bill Warren at the $6.00 rate for Elliott's work and Green would pay Elliott $5.00 of this.[2] Elliott was furnished with a supply of Green's time sheet forms. When he did Warren's work he would prepare one of the forms and sign it as "contractor's [Green's] representative." Green would pay Elliott each week or two weeks at the $5.00 rate and from time to time bill Warren at the $6.00 rate. Elliott was shown on Green's books as an independent contractor, and Green did not withhold income tax from him or pay Social Security for him.

Some of the workers which in the conduct of its business Green furnished to industry were Green's employees. Others, like Elliott, Green treated differently

and considered to be independent contractors, and some of those in this category used Green's time sheets in the same manner as did Elliott. Green had welders, which it supplied to industry and carried on its records as employees.

Initially Green attempted to find jobs for Elliott other than the work for Warren. Elliott performed a few such jobs, using his equipment, for other companies with which Green had contracts. For those jobs Elliott used the same type of [Green] time sheets, and Green received the same $6.00 rate and paid Elliott $5.00 thereof. Later Elliott became reluctant to work on any jobs except those for Warren, fearing that someone else would "get his foot in the door." Ultimately he did Warren jobs exclusively. In practice, Elliott and Warren dealt directly concerning the work Elliott was to do for Warren. Such supervision as Elliott had came from Warren, and Elliott could perceive no difference between the manner and type of work that he performed when on Warren's payroll and that which he performed when "working through" Green. Green never exercised or attempted to exercise supervision. Green did not even know of Elliott's injury until six months after it occurred.[2A]

Green furnished other equipment to Warren under the Green-Warren contract on at least one occasion, and another time supplied to Warren a subcontractor to clean a tank.

The district court's view of the case, as reflected in its jury charge and its denial of charges requested by Green, was that Green's liability as indemnitor turned solely on the characterization of Elliott's relationship with Green and with Warren. It instructed that if Elliott was found to be a servant, agent or employee of Green when injured the verdict should be for Warren; that if Elliott, when injured, was an employee of Warren or Warren's special or borrowed

2. This amount would give Elliott a welder's normal hourly wages plus pay for his equipment.

2A. Green billed Warren, and was paid, for the work being done by Elliott at the time Elliott was injured.

employee, the verdict should be for Green; and that if Elliott was found to be an independent contractor of Green he could not be an agent, servant or employee of Green. Warren, by requested instructions, which were denied, and by its objections to the charge, duly raised the issue of whether the scope of Green's liability was correctly defined. The jury returned a general verdict for Green and answered a special interrogatory that Elliott was working for Green as an independent contractor.

We conclude that the liability of Green for indemnity does not necessarily turn on the characterization of Elliott's employment or contractual status, and for this reason a reversal is required. We hold also that there must be a determination of the extent to which the judgment in the Elliott-Warren suit established matters which are binding on the parties to the present case.

The indemnity agreement arose in the context of a particularized purpose—making available Elliott's services to Warren on a contract basis, "working through" a compensated independent supplier or broker of labor, with Warren to be insulated in at least some degree from injurious consequences of the work arrangement.[3] The *raison d'etre* of the Warren-Green contract was to enable Elliott to work at Warren's Gladewater plant. The insurance requirements, which were imposed "In furtherance of [Green's] indemnity," apply "to operations by Contractor or by any subcontractor or by anyone directly or indirectly employed by either of them," and they include an undertaking of Green to supply workmen's compensation insurance. The indemnity paragraph refers to "activities of Contractor [Green]." Its "activities" as a labor supplier—and here as an indemnifying supplier in a very particularized factual context—are not necessarily limited to the physical acts done by it through Elliott.

The basic question for the jury was the meaning of the indemnity agreement. It might have been intended to mean that Green as a supplier of labor and equipment undertook to indemnify against the consequences of Elliott's being on the Warren premises and working there, without regard to Elliott's precise legal status—employee, agent, servant, independent contractor, borrowed servant, or other capacity—of either Warren or Green or both of them. Consideration of this possibility was foreclosed by the trial court's instructions.

There are other possible constructions of the contract. The jury might find that the contract relates only to what Green does *qua* the physical actions which its servants, agents and employees carry on in performing work for Warren and does not impose on Green a broader responsibility arising from its undertaking as a supplier of labor to interpose itself between Warren and those supplied as workmen. The jury might find that the term servants, agents and employees did (or did not) embrace "independent contractors." The meaning of the term, "servants, agents and employees," and of the terms "activities of Contractor," and, in the provision for insurance, "operations by Contractor," must be ascertained in the light of all the factual circumstances surrounding the contract. *See generally* 13 Tex.Jur.2d Contracts § 126, at 294–98 (1960).

On the few fragments of the personal injury suit record we are unable to determine the effect of the judgment therein on either Warren or Green. Warren, as indemnitee, in an action to recover from its indemnitor amounts paid in satisfaction of the judgment

---

3. Green does not contend on this appeal that Texas forbids one from being indemnified against his own negligence. *See* Ohio Oil Company v. Smith, Tex., 365 S.W. 621 (1963) ; and Spence &

Howe Construction Co. v. Gulf Oil Corp., Tex., 365 S.W.2d 631 (1963) ; Alamo Lumber Co. v. Warren Petroleum Corp., 316 F.2d 287 (5th Cir. 1963).

against it, is bound by all findings without which the judgment could not have been rendered. *See* Alabama Title & Trust Co. v. Millsap, 71 F.2d 518 (5th Cir. 1934); Annot., 24 A.L.R.2d 329, 330 (1952). Green, as indemnitor with notice and opportunity to defend, may be bound by the judgment, if obtained without fraud or collusion, to the extent of issues necessary to be litigated therein.[4] Because these matters are for the district court in the first instance we do not reach Warren's contention that Green is bound by the stipulation, apparently made by Warren, that Elliott was acting as Green's "agent." Likewise we do not pass on Green's argument that Warren acted in bad faith in making the stipulation and in failing to urge as a defense to Elliott's suit that Elliott was an employee of Warren.

The Warren-Green contract contained the following clause:

ASSIGNMENT—Neither the bene-fits accruing to nor the obligations assumed by Contractor in undertaking to perform any work pursuant to any request therefore made by Owner may be assigned in whole or in part, nor shall Contractor sublet or subcontract any of the work so requested without Owner's written consent.

The effect of this clause has not been briefed by either party. We leave this for consideration by the district court on remand.

In summary, the indemnity agreement must be construed under principles applicable to an ambiguous contract, and there must be a determination of whether the indemnity provision as construed covers Elliott's judgment against Warren. Whether issues have been judicially established in Elliott's suit so as to bind either or both parties to this case is for the district court to determine.

Reversed and remanded for proceedings not inconsistent with this opinion.

4. *See* Latimer v. Texas & N.O.R. Co., 56 S.W.2d 933, 936 (Tex.Civ.App.1933); cf. Coblentz v. American Surety Co., 5th Cir., 416 F.2d 1059; American Surety Co. of N. Y. v. Coblentz, 381 F.2d 185 (5th Cir. 1967).