Varena **ELSTON**, wife of/and
Joseph Yuratich
v.
**SHELL OIL COMPANY** and the
Travelers Insurance Company.
No. 71–2696.

United States District Court,
E. D. Louisiana.
May 22, 1973.

---

Peter J. Butler, Steeg, Butler & O'Connor, New Orleans, La., for plaintiffs, Varena Elston, and others.

John J. Weigel, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendants, Shell Oil Co. and Travelers Ins. Co.

Chester Francipane, Metairie, La., for third party defendant, Zenith, Inc.

Wood Brown, III, Montgomery, Barnett, Brown & Read, New Orleans, La., for intervenor, U. S. Fidelity & Guaranty Co.

MITCHELL, District Judge.

Zenith, Inc., is a contract supplier of labor, service and equipment to various oil companies. It entered into what is called a "Blanket Field Purchase Order", designated DFO–69, with Shell Oil Company on March 1, 1969, effective March 3, 1969, until cancelled, under which Zenith agreed "to furnish labor and equipment" on a continuing basis, if, as and when requested by Shell.[1] Attached were schedules of various categories of labor, the hourly rate to be paid Zenith

---

1. Exhibits, Shell Third Party Plaintiff No. 1.

for each category and like categories and rates on various types of equipment.

Each job was covered by a daily "job ticket". Contained thereon was a complete description of the operations performed, the hours worked and the name of Zenith's personnel who worked the specific job. The employee's time was accounted for by maintaining daily time sheets which were submitted to Shell for signature and approval. Thereafter said time sheets were submitted by the employee to Zenith who, in turn, would pay its employee on the basis of these time records. Zenith would then bill Shell for each job on a monthly basis.[2]

Pursuant to the contract, Zenith, on October 2, 1970, at Shell's request, furnished one Melvin Terrebonne as a driver to operate a Shell pick up truck on a regular scheduled mail run from New Orleans to Venice and return. Terrebonne would report each morning to Shell's garage to obtain the truck, and then proceed to drive the truck, containing mail and small packages, to Shell's facilities in Venice.

After arriving in Venice, Terrebonne would usually have lunch; then make the return trip, transporting mail and packages destined for Shell's facility at New Orleans.

In the operation of the mail run, Terrebonne was free to follow whatever route he desired; he took his lunch and coffee breaks at his pleasure. Unlike Shell Oil Company employees, Terrebonne was paid for his lunch hour and the overall charges were submitted to Shell.

On the morning of October 12, 1970, Melvin Terrebonne, performing his duties as Shell's mail run driver, was proceeding towards Venice, Louisiana, on Louisiana Highway 23 when the truck which he was operating left its southbound lane of traffic, crossed over the median line directly into the path of an International pick-up truck which was proceeding in a northerly direction and collided therewith. John H. White was the operator of the latter vehicle and, as a result of the collision, Mrs. Varena Elston Yuratich, a guest passenger in the pick-up truck, suffered severe crippling permanent injuries. Mrs. Yuratich and her husband, Joseph, filed suit against Shell Oil Company and its insurer, Travelers Insurance Company, who in turn filed a third party action against Zenith, Inc. and its insurer, Employers Mutual Liability Insurance Company of Wisconsin. Employers then filed a cross claim against travelers for coverage under the omnibus clause of a policy issued by Travelers to Shell.

The principal demand was tried to a jury, the main issue being whether, under the facts of this case, Terrebonne was a borrowed employee of Shell.

The testimony revealed that Terrebonne was employed by Zenith, received his pay check from Zenith, and only Zenith had the right to hire or fire him.

Although Shell employees told Terrebonne where to go and perhaps when to go and return, no Shell employee ever accompanied Terrebonne on these trips or directed him in the manner in which he should operate the truck or the route which he should follow.[3]

The jury returned a verdict in favor of plaintiffs' against Shell and Travelers, finding that, at the time of the accident, Melvin Terrebonne was a borrowed employee of Shell Oil Company and thus Shell, as the borrowing employer, was vicariously liable for the torts of its employee.[4]

In the third party demand, tried to the Court, the principal issue to be determined is whether, under the terms of the agreement, Shell has a right to be indemnified by Zenith.

2. See Exhibit Zenith No. 1.

3. See Universal Eng. & B. Inc. v. Lafayette Steel Elev. Corp., 235 So.2d 612 (La.App. 1970); 17 A.L.R.2d 1388; 60 A C.J.S. Motor Vehicles, p. 1102; Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252 at pp. 254–256, 53 L.Ed. 480 (1909).

4. B & G Crane Service, Inc. v. Hooley, 227 La. 677, 80 So.2d 369 (1955).

After a review of the evidence, the briefs submitted by counsel and the law, the Court concludes that it does.

## THE CONTRACT

Zenith maintains that the Field Purchase Order is not a legally binding contract between the parties, because there was no meeting of the minds and the contract was signed by Zenith under economic duress.

The Field Purchase Order is a three page document, with printed conditions on the reverse side of each page. On Page 3 thereof, C. Ray Thomassie, as Secretary-Treasurer of Zenith, Inc., approved and accepted the terms of the agreement by affixing his signature in the space provided. Shell Oil Company, through its agent, J. Valenziano, also signed on that same page.[5] Across from Mr. Valenziano's signature is printed the following:

"IMPORTANT: All provisions on the face hereof, as well as all conditions on the back hereof, are part of this order. Read them carefully. No substitutions or changes will be effective without Shell's written approval."

Notwithstanding Zenith's contentions, the Court concludes that the parties entered into a legally binding contract, including all the provisions on the reverse side thereof.

■ A contract is null and void when a party thereto has been induced to execute it through duress or threats,[6] however, there is no evidence whatsoever to substantiate Zenith's contention that Thomassie signed this contract under duress.

Although Mr. Thomassie testified that he did not read the contract in question, Thomassie was no neophyte in furnishing labor and/or equipment to the oil industry. He testified that: indemnity agreements are generally used in the industry; he had a general knowledge of their meaning; he was familiar with this type of contract; Shell and Zenith had entered into prior similar contracts over the years; and he assumed this contract contained a hold harmless agreement. He had read prior contracts and even consulted an attorney on some. Although Thomassie at one point in his testimony said that he was not aware of the indemnity provisions, it is the court's recollection that he later testified that he discussed the contract with his company before he signed it "because I don't like hold harmless clauses".

■ Thomassie had a duty to read the entire contract before he signed it and his failure to do so was negligence on his part. One who signs a written instrument is presumed to know its contents and cannot avoid its obligation merely by contending that he had not read it.[7]

■ The agreement was signed in March of 1969; the accident in question did not occur until October 2, 1970; thus the testimony reflects that both parties adhered to the terms of the contract for some 17 months prior to the accident. At no time during this period of time did Zenith attempt to rescind the contract or contend that no contract existed. As matter of fact, on December 10, 1969, Thomassie accepted an amendment to the contract in letter form, dated December 9, 1969, which states in part:

"Effective immediately, *the subject contract* and/or purchase order is amended . . ." (Emphasis supplied) [8]

5. Exhibits Shell #1; Third party plaintiff #1.

6. Ball v. Campbell, 219 La. 1076, 55 So.2d 250 (1952).

7. Ideal Loan of N. O. Inc. v. Johnson, 218 So.2d 634 (La.App.1969); Hope v. Barham, 28 F.Supp. 561 (E.D.La.1939); Lama v. Manale, 218 La. 511, 50 So.2d 15 (1951); Fontenot v. Corceil, 2 So.2d 97 (La.App. 1941); Price v. Taylor, 139 So.2d 230 (La. App.1962).

8. Exhibit Shell #1.

## INDEMNITY

The Shell-Zenith contract contained the following provisions:

"11. Liability-Indemnity.

Contractor shall be solely responsible for all . . . work until the project is completed to Shell's satisfaction . . . Subject thereto, Contractor shall indemnify Shell against all loss or damage arising out of the negligence of Contractor . . . and not within Contractor's indemnity in the next following sentence. *Contractor shall indemnify and defend Shell and its employees and agents against all claims, suits, liability and expense on account of injury or death of persons . . . arising out of or in connection with the performance of this Order, and not caused solely by Shell's negligence* without any contributory negligence or fault of Contractor . . . " (Emphasis supplied).

Shell contends that under the above provisions, Zenith is obligated to indemnify Shell for the amount of damages it was cast in judgment, including costs, attorney's fees and all sums paid to or on behalf of the Yuratich's pursuant to the advance payment plan.

Zenith's position is that since the jury found Terrebonne to be Shell's borrowed employee, it has no duty to indemnify Shell.[9]

Zenith's liability for indemnity does not necessarily turn on the characterization of Terrebonne's employment status, but depends on whether the indemnity agreement was intended to be independent of status and to mean that Zenith,

as a supplier of labor, undertook to indemnify against the consequences of Terrebonne's work as a mail run driver for Shell, without regard to Terrebonne's precise legal status.[10]

Under the terms of the contract, Zenith was to perform all work diligently, carefully and in a good and workmanlike manner; to furnish labor and supervision necessary therefor; and to perform its work in its own name and as an independent contractor. The Court concludes that the very terms of the contract evidence a clear intent on the part of the parties thereto to establish an independent contractual relationship as between themselves.[11]

Moreover, under the terms of the contract, Zenith was obligated to indemnify Shell against all personal injury claims arising out of or in connection with performance of "this Order" and not caused by Shell's sole negligence.

The Court concludes that Shell was not guilty of negligence, having only vicarious responsibility under the jury's findings.[12]

Shell's contract with Zenith required the latter to maintain workmen's compensation, automotive and general liability insurance.[13] Zenith was required to furnish basic minimum limits of insurance as specified in the contract, including placing Shell as either an additional insured under the policy or obtaining waivers of subrogation against Shell. Zenith carried workmen's compensation insurance for its own employees and its premiums were computed on the basis of total payroll, which would have included

9. See Lambert v. Austin Bridge Co., 189 So. 2d 752 (La.App. 1–1966).

10. Warren Petroleum Corp. v. J. W. Green Contractors, 417 F.2d 242 (CA5–1969) reh. den.; In re: Tidewater Oil Co., 321 F. Supp. 14 (E.D.La.1970) rvs. & rmd.

11. Exhibit Third Party Shell No. 1, Section 10 provides:
"10. Performance.
Contractor shall perform all work diligently, carefully and in a good and workmanlike manner; shall furnish all labor, supervision . . . necessary therefor

. . . *Contractor shall conduct all operations in Contractor's own name and as an independent contractor, and not in the name of, or as agent for Shell.*" (Emphasis supplied)

12. Tri-State Oil Industries, Inc. v. Delta Marine Drilling Co., 410 F.2d 178 (CA5–1969); Appalachian Corp. v. Brooklyn Cooperage Co. 151 La. 41, 91 So. 539 (1922); Stewart v. Roosevelt Hotel, Inc., 170 So.2d 681 (La. App. 4–1965).

13. Exhibit Shell No. 1.

the wages paid by Zenith to Terrebonne as part of the computations. In addition, Zenith carried general liability insurance to protect itself for negligent acts of its employees, which said negligence might be imputed to it.

■ Zenith maintains that all it was called upon to do was to supply a man. However, the Court finds that Zenith was to supply a man who could perform the work, i. e. one who could reasonably and prudently drive a pick-up truck from New Orleans to Venice and return. It was Zenith's obligation to render the service for which it contracted in a workmanlike manner. The Court concludes that the indemnity contract simply expressed the duty to indemnify for the negligent breach of its contractual obligations. The entire contractual scheme demonstrates that the parties intended to fix responsibility to employees and others for damages and they intended that Zenith, as a supplier of labor and equipment, undertook to indemnify against the consequences of Terrebonne's work as a mail run driver for Shell, without regard to Terrebonne's precise legal status.[14]

## INSURANCE

Pursuant to the terms of the agreement between Shell and Zenith, Zenith carried comprehensive automobile general liability insurance and workmen's compensation insurance with Employers Mutual of Wausau.[15]

The testimony reflects that for many years Travelers Indemnity Company has been the insurer for Shell Oil Company. Alexander and Alexander, Inc. have been Shell's insurance brokers, handling its extensive and complicated insurance accounts for at least fifteen years. The Shell policies and endorsements were prepared by Travelers and then transmitted to Alexander and Alexander.[16]

At the time of the accident in question, there was in full force and effect a comprehensive automobile-general liability policy bearing the number 928917–69, issued by Travelers Indemnity Company to Shell Oil Company.[17] Under the terms of the policy, Travelers was obligated to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury.

Zenith and its insurer filed a cross-claim against Travelers, contending that if the Court determined that Zenith is obligated to indemnify Shell for Terrebonne's negligence then, under the omnibus clause of the policy issued by Travelers to Shell, Zenith is an "insured", thus Travelers had the duty to defend Zenith and to pay any sum which it became legally obligated to pay.

The policy defines "Persons Insured" as:

" . . .

(c) any other person while using an *owned automobile* . . . with the permission of the *named insured*, provided his actual operation . . . thereof is within the scope of such permission . . .

(d) any other person or organization but only with respect to his or its liability because of acts or omissions of an *insured* under . . . (c) above."

No one questions the fact that Terrebonne was operating Shell's truck with Shell's permission. Thus, it would appear from the face of the policy that Terrebonne was an insured under section (c) and Zenith an insured under section (d) to whom Travelers owed various duties. However by virtue of a special restrictive endorsement, one who contracts to hold Shell harmless is not an insured under the Travelers policy.

14. See In re Tidewater Oil Company, *supra*; Hanks v. California Company, 280 F.Supp. 730 (W.D.La.1967); See Truitt v. B & G Crane Service, Inc., 165 So.2d 874 (La.App. 4–1964).

15. See Exhibit Zenith #2.

16. Testimony of Allen Watson employed by Shell in its insurance department.

17. Third Party Plaintiff Shell No. 2.

Endorsement 8000(D), attached to the original policy, reads as follows:

"As a condition of the company's issuance of the policy, the insured consents and agrees with the company that such insurance as is afforded by the policy applies subject to the following provisions

The insurance with respect to any person or organization (other than the *named insured* as provided by insuring agreement III) does not apply to any person or organization or to any agent or employee thereof, if such person or organization has entered into any agreement to indemnify the named insured for accidents arising out of the use of automobiles covered by the policy provided, however, that the provisions of this endorsement shall not apply if in conflict with any statute or rule of law."

No statute has been brought to the Court's attention which would make the provisions of this endorsement null and void.

An insurance policy is a contract between two parties; subject to statutory requirements and public policy, the parties may insert any provision or exclusion they desire.

■ Endorsements attached to an automobile insurance policy are part of it and the endorsement will control where it expressly states that its provisions are to be substituted for inconsistent provisions of the policy or where it amends the terms of the policy.[18]

■ Thus the omnibus clause of an automobile liability policy extending coverage, and which extends the status of an insured to others than the named insured using the vehicle, may be limited or restricted by endorsement.[19]

The endorsement in question refers to "Insuring Agreement III" which, in this policy, concerns limits of liability.

■ Shell contends that the endorsement which refers to "insuring agreement III" contains a typographical error, simply copied from prior policies and should be corrected to read "insuring agreement II". We agree.

The testimony and exhibits offered on the trial of this matter revealed that at least since 1963, Shell has had substantially identical coverage with Travelers.[20]

The 1963–66 policy had a different format. It contained a section entitled "Insuring Agreements". Section I pertained to Coverage, Section II to Defense and Settlements, Section III to Definition of Insured and Section IV to Policy Period.

Attached to the 1963 policy was an unnumbered identical special endorsement, cited above as 8000(D).[21]

The 1963 policy was renewed effective July 1, 1966 to July 1, 1969.[22] The renewal contract not only included the same coverage, but the identical exclusion endorsement was contained therein, designated as Endorsement 8000(F).[23]

In October of 1966, sometime after this policy was renewed, the insurance industry revised the printed forms of its contract agreements. As a consequence thereof, certain sections were not only reworded but renumbered.[24] Insuring Agreement I became Agreement I and still pertained to coverage, but Agreement II of the new form became "Persons Insured" and Insuring Agreement III, which under the old policy defined persons insured, now became Agreement III which sets forth the Limits of Liability.

Thus, the renewal policy with which we are concerned, effective July 1, 1969,

18. Fontenot v. State Farm Mut. Ins. Co., 119 So.2d 588 (La.App. 1–1960); Le Blanc v. New Am. Cas. Co., 202 La. 857, 13 So.2d 245 (1943); Hurst v. Hardware Mut. Cas. Co., 234 So.2d 802 (La.App.1970).

19. Hurst v. Hardware Mutual Cas. Co., *supra.*

20. Exhibit Third Party Shell No. 4.

21. Ibid, p. 177.

22. Exhibit Third Party Plaintiff, Shell No. 3.

23. Ibid, p. 78.

24. Exhibit Third Party Plaintiff, Shell No. 2.

to July 1, 1972, is written on the new form of insurance contract.

Travelers' District Manager, Edward D. Gladstone, testified that the intent of the endorsement was not to provide coverage to the permissive user of an automobile when the user or his employer had signed a hold harmless agreement.

Both Gladstone and Shell's employee, Allen Watson, testified that both Shell and Travelers wanted that endorsement in the policy.

Conrad Giles, employed by Alexander & Alexander, testified that: he has handled the Shell Account for 15 years; the special restrictive endorsement has been on the Shell insurance policies for at least that length of time; Shell wanted that endorsement on its policy; and it was intended that it be attached to the policy.

It was the concensus of opinion of the witnesses that when the 1969–1972 policy was renewed, in preparation thereof, the endorsement was simply copied without taking notice of the fact that what in 1969 had been Insuring Agreement III was, under the new policy format, Agreement II. We concur.

■ Although parol evidence is inadmissible to alter, vary or contradict the terms of an insurance policy, it is admissible to show mistake, inadvertence, to explain ambiguity and to show the intention of the parties.[25]

■ Where an insurer has agreed to renew a policy but issues a new policy containing different terms, the policy may be reformed to read the same as the original policy.[26]

Although the original renewal policy contained endorsement 8000(D), a copy of the policy which was forwarded to the Louisiana insurance commissioner on October 14, 1970, 2 days after the accident in question, did not.[27] Zenith contends that failure to file the endorsement with the Casualty & Surety Division of the Louisiana Insurance Rating Commission pursuant to R.S. 22:620, subd. A, renders it null and void and of no effect. La.R.S. 22:620, subd. A provides that:

"No basic insurance policy form . . . or endorsement form shall be issued, delivered, or used unless it has been filed with and approved by the commissioner of insurance. *This Section shall not apply to . . . endorsements designed to delineate the coverage for and used with relation to insurance upon a particular subject; nor which relates . . . to the reservation of rights and benefits under such policy, and which is used at the request of the individual policy holder . . .* " (Emphasis supplied)

■ The Court concludes that the endorsement in question falls within the exception contained in La.R.S. 22:620, subd. A, thus it need not be filed.

However, Mrs. Minta Dugas, a representative of the Casualty & Surety Division of the Louisiana Insurance Rating Commission, testified that the commission enacted a rule that restrictive endorsements must be signed and attached to the policy to have effect. Zenith contends that since the endorsement was not filed with the commission, it violates a rule and hence conflicts with the very provisions of the endorsement itself, as well as with the rules set out by the Commission.

Assuming arguendo that the statute and/or rules of the Commission require the endorsement to be filed, the Court

25. La.C.C.Art. 2276; Rolling v. Miller, 233 So.2d 723 (La.App.1970); Capizzo v. Traders & Gen. Ins. Co., 191 So.2d 183 (La.App. 3–1966); Singleton v. First Nat. Life Ins. Co., 160 So. 437 (La.App.1935).

26. Maryland Cas. Co. v. Kramel, 80 So.2d 897 (La.App.1955); Farwell v. Home Ind. Co. v. City of N. Y., 136 F. 93 (CA5–1905); Richard v. United States Fidelity & Guaranty Co., 175 So.2d 277 (1965).

27. Testimony of Mrs. Minta Dugas, a representative of the La. Insurance Rating Commission.

concludes that failure to file does not render the endorsement ineffective.

The testimony reflects that this endorsement had been a part of the Shell policies at least since 1957. There is no evidence to reflect that it had been approved or rejected by the insurance commissioner on earlier policies, since only current policies or renewal policies were kept by that office.

■ Such a requirement, i. e., that the endorsement must be filed and approved, is designed for the protection of the policy holders and to benefit Louisiana policy holders through the elimination of prohibited clauses.[28]

It appears to the Court that approval by the insurance commissioner constitutes an administrative ruling that the policy and its endorsements conforms to the requirements of the law but a failure of the company to file a form and obtain its approval should not destroy the terms of a contract of insurance which it in fact has made.[29]

As was pointed out, both the insurer and the named insured desired and intended that this restrictive endorsement be attached to this policy. It was the intent of the parties long before the accident in question that Travelers would not be liable under the terms of the policy for personal injuries arising out of the operation of a Shell pick up truck by the employee of an independent contractor, if said contractor had executed an indemnity agreement holding Shell harmless for the negligence of its employee. We do not think that the mere neglect of some clerk, employed by the insurer or by the insurance broker, in failing to file this endorsement with the insurance commissioner bars the insured or the insurer from excluding this type of coverage from its policy.[30]

Let judgment be entered in favor of Third Party plaintiffs, Shell Oil ompany and Travelers Insurance Company and against Third Party Defendants, Zenith, Inc. and Employers Mutual Liability Insurance Company of Wisconsin allowing Shell Oil Company and Travelers Insurance Company full reimbursement for all amounts they are required to pay pursuant to the judgment rendered in favor of original plaintiffs and against Shell and Travelers, together with interest and costs.

On the cross claim, let judgment be entered in favor of Travelers Insurance Company and against Zenith, Inc. and Employers Mutual Liability Insurance Company of Wisconsin, dismissing said cross claim.

■ As to attorney's fees, the Court will allow Shell Oil Company reasonable attorney's fees only in defense of the claim indemnified against to be fixed by this Court on motion and hearing if the parties cannot agree thereon.[31]

---

28. See 28 TLR pp. 171, 172.

29. 44 C.J.S. Insane Persons, p. 253.

30. See Phoenix Indm. Co. v. Marquette Cas. Co., 320 F.2d 486 (CA5–1963).

31. Jennings v. Ralston Purina Co., 201 So.2d 168 (La.App. 1–1967), writ ref., 251 La.

216, 203 So.2d 554; Singer v. Dorr, 272 F. Supp. 931 (E.D.La.1967); Williams v. California Co., 289 F.Supp. 376 (E.D.La.1968); Treme v. American Mutual Liability Insurance Co., 260 So.2d 41 (La.App. 3–1972) writ ref., 261 La. 1055, 262 So.2d 40.