746 F.2d 1087
 Sherman Michael SMITH, Et Al., Plaintiffs,
v.
SHELL OIL COMPANY, Defendant-Third Party Plaintiff-Appellee,
v.
OFFSHORE SANITATION & EQUIPMENT RENTAL SERVICES, INC., Third
Party Defendant-Appellant-Appellee,
and
PRESSURE SERVICES, INC., Third Party Defendant-Appellee,
v.
WESTERN WIRELINE SERVICES, INC., Third Party Defendant-Appellant.
Sherman Michael SMITH, Et Al.,
Plaintiffs-Appellees-Appellants, Cross-Appellants,
v.
SHELL OIL COMPANY, Defendant-Third Party
Plaintiff-Appellant-Cross-Appellee,
v.
PRESSURE SERVICES, INC., Third Party
Defendant-Appellant-Cross-Appellee,
Western Wireline Service, Inc. and Offshore Sanitation and
Equipment Rental Services, Inc., Third Party
Defendants-Appellees.
 Nos. 82-4364, 83-4056.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 27, 1984.
 
 Allen, Gooch, Bourgeois, Breaux & Robison, St. Paul Bourgeois, IV, Lafayette, La., for Western Wireline.
 Stassi & Rausch, Joseph W. Rausch, New Orleans, La., for Pressure Service, Inc.
 Levy & Burleigh, Lawrence K. Burleigh, Morgan City, La., for Smith.
 Bernard & Angelle, Randy P. Angelle, Lafayette, La., John P. Campbell, III, Metairie, La., for Porche and Smith.
 Leger & Mestayer, Walter J. Leger, Jr., Michael J. Mestayer, New Orleans, La., Guy W. Olano, Jr., Kenner, La., for Latham.
 Gibbens & Blackwell, John Blackwell, New Iberia, La., for Offshore Sanitation.
 Adams & Reese, Joel L. Borrello, Lynn M. Luker, Arthur A. Crais, Jr., New Orleans, La., for Shell Oil.
 Appeal from the United States District Court for the Western District of Louisiana.
 Before BROWN, GEE, and WILLIAMS, Circuit Judges.
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 This appeal arises from claims for personal injuries resulting from a gas fire on a fixed platform on the outer Continental Shelf which occurred on November 6, 1980. Because we find ample evidence to support the jury's findings as well as the trial court's findings regarding indemnity, we affirm. We reverse the award of interest from the date of judgment and remand for modification to allow interest from the date of judicial demand.
 
 How It All Began
 
 2
 Shell Oil Company (Shell) engaged Pressure Services, Inc. (PSI) to perform reconditioning work on the well located on a fixed platform on the outer Continental Shelf. Before reconditioning work could be performed, the well had to be killed. Shell contracted with PSI to perform the well killing services and to change corroded tubing.[1] Sherman Michael Smith and Kevin Porche were employed by PSI. Shell also sought the services of Western Wireline Services, Inc. (Wireline) to provide wireline services after the well had been killed.[2] Henry Latham was employed by Wireline.
 
 
 3
 Movable housing units and an office building were leased by Shell from Offshore Sanitation and Equipment Rental Services, Inc. (OSERS) to accomodate the men during the workover operations.[3]
 
 
 4
 Prior to the reconditioning operation a prognosis was prepared by Shell engineers and furnished to PSI. The prognosis indicated that the current status of the well was an active gas reservoir.[4] The prognosis provided that preliminary operations would cover killing the well and pulling and replacing the tubing. With this procedure in mind, Shell ordered from PSI specific equipment for the operation.[5] Included in that list was a request for two open tanks.
 
 
 5
 On November 4, 1980 the equipment, living quarters, and the office were arranged on the platform. The living quarters were placed within twelve to eighteen inches of an open tank into which gas would be bled. On November 5, the well killing operations began. To kill the well, salt water was pumped into the tubing to displace gas. A bleeding line was run from the casing head through an adjustable choke and out an open pipe which lay over an open tank. Gas and salt water bled from the end of this line into the open tank.
 
 
 6
 On November 6, near the time of the accident, Porche was working on the well killing operations. Smith retired from 36 hours of work at approximately 1:00 to 1:30 that afternoon and returned to the crew quarters to shower and sleep until approximately 5:45 p.m. Latham, the Wireline employee, gratuitously relieved a PSI employee and operated the adjustable choke on the bleeding line. Roman, the Shell platform supervisor, replaced Smith that afternoon. Late in the afternoon gas and fluid were vented through the bleeding line into the open tank next to the living quarters. The wind had died down. Latham was manipulating the adjustable choke on the bleeding line which was allowing gas to escape. However, gas collected in the work area and the living quarters and ignited. An explosion and fire occurred and all three men were severely burned.
 
 
 7
 Smith and Porche sued Shell and Wireline and Latham sued Shell, PSI, and OSERS. Shell cross-claimed and brought a third party claim against PSI, Wireline, and OSERS seeking indemnity. PSI also cross-claimed against Shell and Wireline for indemnity. At the close of all the evidence, the trial court granted plaintiffs' oral motion for a directed verdict against Shell for strict liability claims under La.Civ.Code Ann. art. 2322. Liability against Shell, PSI, and OSERS for negligence and the existence of defective equipment and living quarters was submitted to the jury on special interrogatories pursuant to F.R.Civ.P. 49(a). The jury found Shell 50% at fault and PSI 50% at fault; however, OSERS and Wireline were not found to be negligent. By consent the indemnity issue was resolved by the trial judge. The trial court found that PSI was required under the blanket service agreement (see note 1 supra and note 8 infra) to indemnify Shell but since Wireline and OSERS were exonerated by the jury each escaped liability for indemnity.
 
 Onshore Negligence
 
 8
 In the trial court, PSI moved for j.n.o.v. and new trial contending that the jury findings were inconsistent.[6] PSI argues that the findings are inconsistent because there was no finding of negligence on the part of any of its employees and there was no evidence adduced at trial which would support an independent finding of negligence on the part of PSI. In Maxey v. Freightliner Corp., 665 F.2d 1367, 1371 (5th Cir.1982) (en banc), we reiterated the standard of review for a j.n.o.v. established in Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir.1969) (en banc); see also Moncrief v. U.S., 730 F.2d 276, 279-80 (5th Cir.1984). In Boeing we determined that a motion for a j.n.o.v. should be granted only when the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict. We are required to consider all of the evidence in the light and with all reasonable inferences most favorable to the party opposed to the motion. If there is evidence of such quality and weight that reasonable and fair minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied and the case submitted to the jury. There must be a conflict in substantial evidence to create a jury question.
 
 
 9
 We affirm the District Court's denial of the motion for j.n.o.v. because the evidence was sufficient to create a question for the jury under the standard established in Boeing. There was sufficient evidence adduced at trial from which the jury could have inferred that PSI was liable for onshore negligence. The testimony at trial indicated that PSI was an expert in snubbing and workover operations and conducted its normal activities in the presence of gas. Pursuant to its contract with Shell, PSI was engaged to kill an active gas well and to change tubing. The prognosis prepared by Shell made clear that gas would be displaced during the operations. PSI had the prognosis in its possession in advance of the operation and before its crew went aboard the platform. Thus, there was ample evidence that PSI knew of the hazardous nature of the activities to be performed on the platform. From this evidence the jury could have concluded that PSI failed to take proper precautions in light of its knowledge of the presence of gas and the possible hazardous conditions created thereby. The jury could have found that PSI failed to anticipate the danger created from the use of an open tank which could not contain the vented gas. We agree with the trial court's conclusion that the jury apparently concluded that both PSI and Shell were at fault because they relied on the wind to dissipate the gas and because they failed to furnish the proper equipment to remove the gas from the work area.
 
 
 10
 For the same reasons we also affirm the trial court's denial of PSI's motion for a new trial. On appeal we review whether the District Court has abused its discretion in denying a new trial. Bunch v. Walter, 673 F.2d 127, 131 (5th Cir.1982); Urti v. Transport Commercial Corp., 479 F.2d 766, 769 (5th Cir.1973). Here, the trial judge did not abuse his discretion in denying the motion because there was ample evidence to support the jury's verdict that PSI was concurrently at fault.
 
 
 11
 PSI urges that the jury verdict is inconsistent since the record lacks evidence from which the jury could have concluded that PSI was negligent independent of the acts of its employees on the platform. Special interrogatories pursuant to F.R.Civ.P. 49(a) were submitted to the jury.[7] The jury found PSI negligent but found that its employees, Smith and Porche, were not negligent. The Seventh Amendment requires that if there is a view of the case which makes the jury's answers to the special interrogatories consistent, the Court must adopt it and enter judgment accordingly. Atlantic & Gulf Stevedores v. Ellerman Lines, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798, 806-07 (1962); Griffin v. Matherne, 471 F.2d 911, 915 (5th Cir.), reh'g denied, 474 F.2d 1347 (1973). Our review of the record persuades us that there is ample evidence to support a view which makes the answers consistent. For the same reasons stated earlier, the jury could have concluded that PSI was negligent for failing to anticipate the displacement of gas during the workover operations and failing to furnish equipment which would displace the gas. PSI's argument is without merit.
 
 Indemnity
 
 12
 Shell sought indemnity from PSI pursuant to the indemnity provisions of the blanket service agreement.[8] The trial judge concluded that Shell was entitled to full indemnity from PSI. PSI disagrees.
 
 
 13
 PSI argues that the indemnification agreement is void and against public policy. In support of this argument, PSI suggests that we follow the analysis in Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955). In Bisso the court held that in towage, a towboat could not contract against all liability for its own negligent towage because such contracts were against public policy. Bisso is distinguishable because it involves a towage contract which falls within the court's federal maritime jurisdiction. In this case we apply the law of Louisiana.[9]
 
 
 14
 PSI also asserts that the policy considerations underlying La.Rev.Stat.Ann. Sec. 9:2780[10] (West Supp.1984) should be applied even though the agreement and injury in this case occurred before its effective date.
 
 
 15
 The Louisiana legislature has expressed its intention to prohibit certain indemnification agreements which require indemnification when there is negligence or fault on the part of the indemnitee. The Act purports to apply prospectively: "[T]he provisions of this Act shall not apply to a contract providing indemnity to the indemnitee when such contract was executed before the effective date ... and which ... governs a specific terminable performance...." La.Rev.Stat.Ann. Sec. 9:2780 I. The Act would apparently void indemnity agreements in master-service contracts or blanket contracts because they do not provide for a specific terminable performance. However, a Louisiana court faced with the identical situation now before this court, held that the Act would not apply retroactively in a case in which the Statute became effective more than 17 months after the injury and more than 18 months after a policy amendment providing coverage for claims arising out of the indemnity agreement. Great Atlantic Insurance Co. v. Martin Services International, Inc., 445 So.2d 146, 148 (La.App. 3d Cir.1984).[11] In this matter, the blanket service agreement was entered into in May, 1980, and the injury occurred in November, 1980. Consistent with Rodrigue v. Aetna Cas. and Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969) we apply the law of Louisiana as surrogate federal law. So doing, we think that the Act does not apply retroactively to this agreement. Cf. Mills v. Zapata Drilling Co., 722 F.2d 1170 (5th Cir.1983).
 
 
 16
 PSI also asserts that the indemnity provision is ambiguous and unenforceable since it does not reflect an intent of the parties to provide for indemnification caused by the indemnitee's (Shell) negligence or for losses arising out of strict liability. We are persuaded that the indemnity provision clearly encompasses negligence of the indemnitee and losses arising from strict liability. Hyde v. Chevron U.S.A., Inc., 697 F.2d 614, 633-35 (5th Cir.1983);[12] Dickerson v. Continental Oil Co., 449 F.2d 1209, 1221 (5th Cir.1971), cert. denied, 405 U.S. 934, 97 S.Ct. 942, 30 L.Ed.2d 809 (1972). The indemnity provision is triggered by a finding of concurrent negligence. In Monson v. Shell Oil Co., 412 F.2d 294 (5th Cir.1969), we dealt with an indemnity provision almost identical to the one at bar:
 
 
 17
 Contractors shall indemnify Shell and hold it harmless from and against all claims of and liability to third parties (including, without limitation, all employees of Shell of contractor and all subcontractors and their employees) for injury to or death of persons or loss of or damage to property arising out of or in connection with the performance of this contract, except where such injury, death, loss or damage has resulted from the negligence of Shell without negligence or fault on the part of the contractor or any subcontractor. (emphasis supplied).
 
 
 18
 Monson, 412 F.2d at 295-96. In that Louisiana diversity case, Shell appealed the jury's finding that Shell alone was negligent and it thus was not entitled to indemnity. We disagreed with Shell's contention that it was entitled to indemnity even though the contractor was without fault: "Shell could collect from ... [the contractor] only if ... [the contractor or subcontractor] were concurrently negligent with Shell."[13] 412 F.2d at 296. Because we find that the jury's finding of concurrent fault is amply supported by the evidence, we hold that Shell is entitled to full indemnity from PSI.
 
 
 19
 PSI contends that even if the indemnification agreement is in effect, PSI's obligation to indemnify Shell is limited to insurance coverage required under the contract. Hicks v. Ocean Drilling and Exploration Co., 512 F.2d 817, 826 (5th Cir.1975), cert. denied, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976); Dickerson, 449 F.2d at 1222. The trial court concluded that in Dickerson the contract specifically required that insurance be secured to cover obligations imposed by the indemnity provision[14] and that in the present case, no such reference was made. The trial judge found that Shell's right to recover under the contract was not limited by the insurance provision.[15] We agree and conclude that there is an absence of a clear intention to limit PSI's liability to the stated limits of the required insurance provision.
 
 
 20
 PSI also suggests that its liability is similarly limited by the provisions of the pollution control and responsibility clause. That clause provides:
 
 
 21
 [C]ontractor shall assume all responsibility for, including control and removal of, and indemnify and hold Shell harmless against and from loss, cost or damage arising from pollution or contamination: ... 2. Resulting from fire, blowout, cratering, seepage, or any other uncontrolled flow, from surface or subsurface, of oil, gas or water from wells during the conduct of operations hereunder, when caused by Contractor's ordinary negligence, but only up to and not in excess of the first $ *[16] per occurrence of such loss, cost or damage....
 
 
 22
 PSI asserts that the release of gas into the atmosphere amounted to pollution and that under the contract Shell is thus obligated to pay all losses stemming from fire in excess of $50,000. The amount of the judgment over and against PSI must therefore be limited to $50,000. We are persuaded that the trial court correctly concluded that PSI's liability is not limited by this clause. The clause clearly applies to pollution resulting from the uncontrolled flow of gas. The trial court found, and we agree that there was strict control over the released gas and that the explosion occurred when the gas was allowed to accumulate. Moreover, the contract provides "[T]he pollution clause listed below does not in any way limit, modify, or supersede the General and Work Order Condition of the Blanket Service Agreement form nor any other provisions which may be specified on the order, but are to be considered in addition thereto." This provision clearly indicates that neither party intended that the pollution clause would in any way limit the indemnity provision.
 
 
 23
 OSERS and Wireline assert a claim for damages and costs of defense pursuant to the pollution control clause in the blanket service agreement.[17] They contend that Shell was in charge of venting gas into the atmosphere which resulted in pollution. Since the jury found Western and OSERS not at fault, they argue that the trial court erred when it rejected this claim. We conclude that the claim was correctly rejected by the trial judge for the same reasons we expressed earlier in this opinion. The pollution clause did not apply to the release of gas and resulting explosion because that clause applies to pollution resulting from the uncontrolled flow of gas.
 
 Remittitur
 
 24
 PSI urges this court to order a remittitur of the jury's award for Sherman Michael Smith's damages for pain and suffering. The jury awarded $3,000,000 to Smith.[18] The trial judge ordered a remittitur reducing the jury's award for pain and suffering (approximately $1,000,000) and concluded that $600,000 was the maximum amount that the jury was entitled to award for general damages in this case. PSI now seeks an additional reduction. We may not reject a jury's award of damages "unless the verdict is so gross as to be contrary to right reason." Terry v. Raymond International, Inc., 658 F.2d 398, 404 (5th Cir.1981), cert. denied, 456 U.S. 928, 102 S.Ct. 1975, 72 L.Ed.2d 443 (1982) (quoting Hatfield v. Anthony Forest Products Co., 642 F.2d 175, 178 (5th Cir.1981)); see also Sosa v. M/V LAGO IZABAL, 736 F.2d 1028, 1035 (5th Cir.1984); Gorsalitz v. Olin Mathieson Chemical Corp., 429 F.2d 1033 (5th Cir.1970), appeal after remand, 456 F.2d 180 (5th Cir.), cert. denied, 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972).
 
 
 25
 Smith suffered second and third degree burns over 90% of his body. The evidence reveals that the only part of his body spared was that covered by his undershorts and one foot covered by his sock. Smith was in intensive care for 54 days. He received treatment for kidney problems and a chemical imbalance in addition to burn therapy. At the time of trial Smith underwent several skin grafts and would require additional surgery. Smith also required psychiatric counseling and will continue to need it for the remainder of his life. Smith will continue to suffer from chronic itching, inability to sweat, scar tissue problems, and burned vocal chords causing him to speak in a hoarse voice. He must always wear a body stocking and avoid moderate to strenuous activity and sunlight. We conclude that although the award as remitted by trial judge was generous, it was not so gross as to be contrary to right reason. Terry, 658 F.2d at 404, Gorsalitz, 429 F.2d at 1045.
 
 Interest
 
 26
 Smith, Porche, and Latham argue that they are entitled to legal interest from the date of judicial demand pursuant to La.Rev.Stat.Ann. Sec. 13:4203.[19] Without any discernible articulation of reason by the trial judge but presumably on the basis of Berry v. Sladco, Inc., 495 F.2d 523 (5th Cir.1974), and Aymond v. Texaco, Inc., 554 F.2d 206 (5th Cir.1977)[20] the trial court rejected the application of prejudgment interest and awarded interest from August 20, 1982, the date of the original judgment.
 
 
 27
 In Rodrigue v. Aetna Casualty and Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), the Supreme Court made clear that in an OCSLA case, federal law supplemented by the law of the adjacent state would be applied to these artificial islands. The law of the state of Louisiana, adopted herein as surrogate federal law provides that prejudgment interest is a substantive right and accrues as a matter of right from the date of judicial demand. Merchant v. Montgomery Ward & Co., 83 So.2d 920, 925 (La.App. 1st Cir.1955) (Tate, J.); see also Plauche v. Consolidated Co., 235 La. 692, 105 So.2d 269, 274 (1958), LeBlanc v. New Amsterdam Casualty Co., 202 La. 857, 13 So.2d 245 (1943), Auger v. Auger, 434 So.2d 492 (La.App.2d Cir.1983). This court recently harmonized its former decisions on the subject of prejudgment interest in Olsen v. Shell Oil Co., 708 F.2d 976 (5th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 715, 79 L.Ed.2d 178 (1984). The court in Olsen concluded that an award of prejudgment interest in an OCSLA case was justified by the Louisiana statute providing for interest from the date of judicial demand and affirmed the award of prejudgment interest granted in that case. The district judge in the case at bar did not have the benefit of our Olsen opinion. Thus, for the same reasons expressed in Olsen we believe that prejudgment interest should be awarded. In summary, we reverse and remand for modification of that judgment to include prejudgment interest.
 
 Juror No. 21
 
 28
 PSI argues that the trial judge's failure to excuse Juror 21 for cause deprived it of its only preemptory challenge. Juror 21 was a district engineer for offshore production for ARCO. PSI urges that Juror 21's responses during voir dire indicate that he should have been excused for cause. During voir dire, Juror 21 revealed that he was involved in investigating accidents and is a "so-called expert witness." The following colloquy took place.
 
 
 29
 THE COURT: In other words, you cannot try this case based on some other accident that you have been involved with. This case must be tried on its own merits, that is based on the evidence presented in this case rather than based on some other accident that a jury member has been involved in. Could you do that, sir? Could you try this case based on its own merits, that is the evidence presented in this case? I do not mean that you have to leave your experience at home, but your decision should be based on the evidence presented in this case. Can you do that, sir?
 
 
 30
 JUROR 21: Yes, sir, I guess.
 
 
 31
 THE COURT: Well, you seem hesitant. Would you acknowledge that the litigants in this case are entitled to have their trial and factual decisions made based on the evidence that is presented in this case?
 
 
 32
 JUROR 21: Very definitely.
 
 
 33
 THE COURT: Would you have any problem doing that?
 
 
 34
 JUROR 21: I hope not, no, sir.
 
 
 35
 THE COURT: Well, do you have a hesitancy, are you unsure that you would be able to do that?
 
 
 36
 JUROR 21: No, sir, I guess not.
 
 
 37
 All challenges for cause must be determined by the court. 28 U.S.C. Sec. 1870. The determination made by the court will not be set aside on appeal unless the error is manifest. In Stewart v. Texas and Pacific Railway Co., 278 F.2d 676 (5th Cir.1960), this court discussed and quoted Reynolds v. United States, 98 U.S. 145, 156, 157, 25 L.Ed. 244, 246, 247 (1878) which dismissed the overruling of a challenge for cause. We think that discussion applies with equal force in this case:
 
 
 38
 "It is clear, therefore, that upon the trial of the issue of fact raised by a challenge for such cause the court will practically be called upon to determine whether the nature and strength of the opinion formed are such as in law necessarily to raise the presumption of partiality. The question thus presented is one of mixed law and fact, and to be tried, as far as the facts are concerned, like any other issue of that character, upon the evidence. The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest. No less stringent rules should be applied by the reviewing court in such a case than those which govern in the consideration of motions for new trial because the verdict is against the evidence. * * * The case must be one in which it is manifest the law left nothing to the 'conscience or discretion' of the Court. * * *
 
 
 39
 " * * * Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case. The affirmative of the issue is upon the challenger."
 
 
 40
 Stewart, 278 F.2d at 678. We hold that the district court acted within the bounds of its discretion when it refused to strike the prospective juror for cause. The record demonstrates that the trial court adequately questioned the juror during voir dire to assure his impartiality.
 
 
 41
 AFFIRMED IN PART, REVERSED IN PART and REMANDED.
 
 
 
 [1]
 The contract between PSI and Shell was a blanket service agreement dated May 28, 1980
 
 
 [2]
 Wireline and Shell also entered into a blanket service agreement dated June 7, 1978
 
 
 [3]
 OSERS entered into a blanket service agreement with Shell dated May 4, 1977 to cover the leasing of the housing units and office buildings
 
 
 [4]
 The prognosis is a Shell document dated October 24, 1980. The document contains detailed sketches of the well
 
 
 [5]
 The Shell purchase order required that PSI furnish several pieces of equipment and manpower. We are here concerned with the two one hundred-barrel tanks with blenders ordered by Shell into which gas and fluids were vented
 
 
 [6]
 Special Interrogatories to the Jury:
 No. 1: A) Do you find that any of the equipment on Platform 188-B in the
 custody of Shell was defective?
 ANSWER "YES" OR "NO"
 ANSWER No
 ----
 B) If so, was such defect a cause-in-fact of the explosion and fire
 aboard the platform?
 ANSWER "YES" OR "NO"
 ANSWER No
 ----
No. 2: A) Do you find that any of the equipment on Platform 188-B in the
 custody of Pressure Services, Inc., was defective?
 ANSWER "YES" OR "NO"
 ANSWER No
 ----
 B) If so, was such defect a cause-in-fact of the explosion and fire
 aboard the platform?
 ANSWER "YES" OR "NO"
 ANSWER No
 ----
No. 3: A) At the time the living quarters aboard Platform 188-B on November
 6, 1980, left the custody of Offshore Sanitation, was it defective
 or unreasonably dangerous to normal use?
 ANSWER "YES" OR "NO"
 ANSWER No
 ----
 B) If so, was such defect a cause-in-fact of the explosion and fire
 aboard Platform 188-B on November 6, 1980?
 ANSWER "YES" OR "NO"
 ANSWER No
 ----
No. 4: Was the defendant Shell Oil Company guilty of negligence which was a
 cause-in-fact of the explosion and fire aboard Platform 188-B on
 November 6, 1980?
 ANSWER "YES" OR "NO"
 ANSWER Yes
 -----
No. 5: Was the defendant, Western Wireline Services, Inc., guilty of
 negligence which was a cause-in-fact of the explosion and fire
 aboard Platform 188-B on November 6, 1980?
 ANSWER "YES" OR "NO"
 ANSWER No
 ----
No. 6: Was the defendant Pressure Services guilty of negligence which was a
 cause-in-fact of the explosion and fire aboard Platform 188-B on
 November 6, 1980?
 ANSWER "YES" OR "NO"
 ANSWER Yes
 -----
No. 7: Was the defendant Offshore Sanitation guilty of negligence which was
 a cause-in-fact of the explosion and fire aboard Platform 188-B on
 November 6, 1980?
 ANSWER "YES" OR "NO"
 ANSWER No
 ----
No. 8: Was plaintiff, Henry Latham, guilty of negligence which was a
 cause-in-fact of his injury?
 ANSWER "YES" OR "NO"
 ANSWER No
 ----
No. 9: Was plaintiff, Sherman Michael Smith, guilty of negligence which was
 a cause-in-fact of his injury?
 ANSWER "YES" OR "NO"
 ANSWER No
 ----
No. 10: Was plaintiff, Kevin Porche, guilty of negligence which was a
 cause-in-fact of his injury?
 ANSWER "YES" OR "NO"
 ANSWER No
 ----
No. 11: Did plaintiff, Henry Latham, voluntarily and knowingly assume the
 risk of any injury he sustained on November 6, 1980?
 ANSWER "YES" OR "NO"
 ANSWER No
 ----
No. 12: What amount do you find will adequately compensate the plaintiff,
 Sherman Michael Smith, for the damage sustained by him as a result
 of injuries he suffered in the November 6, 1980, accident? Answer by
 means of a numerical figure.
 ANSWER $3,000,000
 ----------
No. 13: What amount do you find will adequately compensate the plaintiff,
 Kevin Porche, for the damage sustained by him as a result of
 injuries he suffered in the November 6, 1980, accident? Answer by
 means of a numerical figure.
 ANSWER $90,000
 -------
No. 14: What amount do you find will adequately compensate the plaintiff,
 Henry C. Latham, for the damage sustained by him as a result of
 injuries he suffered in the November 6, 1980, accident?
 ANSWER $230,000
 With respect to the parties you have found were at fault and those whose
 actions contributed to plaintiff's injuries, state below the extent to which
 each such party's actions contributed to those injuries. Answer by means of a
 numerical percentage from 0% to 100%.
 Shell Oil Co. 50%
 ---
 Pressure Services, Inc. 50%
 ---
 ------
 100%
 
 
 [7]
 We have repeatedly urged the use of special interrogatories. See, e.g., Ware v. Reed, 709 F.2d 345, 355 (5th Cir.1983); Wood v. Diamond M Drilling Co., 691 F.2d 1165 (5th Cir.1982); J.C. Motor Lines, Inc. v. Trailways Bus System, Inc., 689 F.2d 599 (5th Cir.1982); Jones v. Miles, 656 F.2d 103, 106 n. 3 (5th Cir.1981); Guidry v. Kem Mfg. Co., 598 F.2d 402, 403, 405-06 (5th Cir.1979); Nardone v. Reynolds, 538 F.2d 1131, 1137 n. 16 (5th Cir.1976); reh'g denied, 546 F.2d 906 (1977); Jamison Co. v. Westvaco Corp., 526 F.2d 922, 934-35 (5th Cir.) reh'g denied, 530 F.2d 34 (1976); Kestenbaum v. Falstaff Brewing Corp., 514 F.2d 690, 693-94 (5th Cir.1975), cert. denied, 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976); Simmons v. King, 478 F.2d 857, 862 n. 12 (5th Cir.1973); Burns v. Anchor-Wate Co., 469 F.2d 730, 734 n. 8 (5th Cir.1972); In re Double D Dredging Co., 467 F.2d 468, 469 (5th Cir.1972); Bailey v. Kawasaki-Kisen, K.K., 455 F.2d 392, 394 (5th Cir.1972). See generally Brown, Federal Special Verdicts: The Doubt Eliminator, 44 F.R.D. 338 (1967)
 
 
 [8]
 The blanket service agreement provided in part:
 Liability-Indemnity. Contractor [PSI] shall be solely responsible for all materials, equipment, and work until the project is completed to Shell's satisfaction, excepting only for loss of or damage to work in progress including materials on the premises and intended for incorporation in the work in excess of $1,000 per occurrence caused by any peril that would be covered by a standard fire and extended coverage policy including vandalism and malicious mischief. Contractor shall be solely responsible for tools, equipment and other personal property owned, rented or leased by Contractor or any subcontractor or employee of either which are not to be incorporated in the work. Contractor shall indemnify Shell against all loss of or damage to Shell's existing facilities arising out of the negligence of contractor or any subcontractor or their employees or agents. Contractor shall defend and indemnify Shell, its employees, and agents, against all losses, claims, suits, liability, and expense arising out of injury or death of persons (including employees of Shell, Contractor or any subcontractor) or damage to property resulting from or in connection with performance of this order and not caused solely by Shell's negligence without any contributory negligence or fault of Contractor or any subcontractor or their employees or agents. Shell may participate in the defense of any such claim or suit without relieving Contractor of any obligation hereunder. (emphasis supplied)
 
 
 [9]
 The Outer Continental Shelf Lands Act, 43 U.S.C. Secs. 1331 et seq., Sec. 1333 provides in pertinent part:
 (2)(A) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws ... the civil and criminal laws of each adjacent State ... are declared to be the law of the United States....
 In this OCSLA case the law of the state of Louisiana is adopted as surrogate federal law. Rodrigue v. Aetna Cas. and Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969).
 
 
 [10]
 La.Rev.Stat.Ann. Sec. 9:2780 (West Supp.1984) provides in pertinent part:
 A. The legislature finds that an inequity is foisted on certain contractors and their employees by the defense or indemnity provisions ... contained in some agreements pertaining to wells for oil, gas, or water, or drilling for minerals ... to the extent those provisions apply to death or bodily injury to persons. It is the intent of the legislature by this Section to declare null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee ... or an independent contractor who is directly responsible to the indemnitee.
 
 
 [11]
 The Act provides in pertinent part:
 I. This Act shall apply to certain provisions ... designed to provide indemnity to the indemnitee for all work performed between the indemnitor and the indemnitee in the future. This specifically includes what is commonly referred to in the oil industry as master or general service agreements or blanket contracts in whatever form.... The provisions of this Act shall not apply to a contract providing indemnity to the indemnitee when such contract was executed before the effective date of this act and which contract governs a specific terminable performance of a specific job or activity listed....
 In Tobin v. Gulf Oil Corp., 535 F.Supp. 116 (E.D.La.1982) an injury occurred on June 4, 1980 and suit was brought against Gulf which filed a third party complaint against Tobin's employer under a workover contract dated December 13, 1979. The court refused to apply the Statute to an accident which occurred prior to the effective date of the Statute and held that the indemnity clause clearly and unambiguously provided for indemnity in that suit. In Great Atlantic the Louisiana Court of Appeals determined that they would "adopt and ordain" the rationale in Tobin, 445 So.2d at 148.
 
 
 [12]
 At issue in Hyde was the applicability of an indemnity clause to strict liability. We held in that case that the clear intention of the parties was that the indemnity agreement encompassed claims based upon strict liability under the Louisiana Civil Code. The indemnity provision in Hyde is as follows:
 Contractor ... shall be responsible for, and shall defend, indemnify and hold operator ... harmless from and against, any claims for damages for loss or destruction of property of Contractor, or for injury to, impairment of health of, or death of employees of Contractor ... that may arise from Contractor's operations under this agreement.
 Hyde 697 F.2d at 633 (emphasis in original).
 
 
 [13]
 See also Elston v. Shell Oil Co., 376 F.Supp. 968 (E.D.La.1973), aff'd, 495 F.2d 1371 (5th Cir.1974)
 
 
 [14]
 In Dickerson the insurance coverage clause stated:
 Comprehensive General Liability Insurance with Bodily Injury limits of not less than $100,000 for one person and $300,000 for any one accident.... Such policy shall be written to cover all obligations imposed by Article VI of this contract, and to include coverage for surface damage from blowout and cratering.
 We held in Dickerson that this provision clearly stated the limits of the contractor's liability. 449 F.2d at 1222.
 
 
 [15]
 Paragraph 12 of the general conditions section dealing with insurance coverage states:
 Insurance. Contractor shall maintain at all times the following insurances, with insurers satisfactory to Shell, and limits not less than those specified: (a) Workers' Compensation Insurance complying with any statutory requirements, and Employer Liability Insurance with a limit of $100,000 per occurrence; (b) Comprehensive Automobile Liability Insurance with limits of $50,000 per person and $100,000 per occurrence for bodily injury or death and $25,000 per occurrence for property damage, (c) Comprehensive General Liability Insurance with a limit of $100,000 per occurrence for bodily/personal injury or death, and $100,000 per occurrence for property damage, or alternatively, $100,000 combined single limit for bodily/personal injury or death and property damage; (d) Any such other insurance as Shell may require.
 Whenever requested, Contractor shall furnish evidence satisfactory to Shell that such insurances are in effect.
 
 
 [16]
 The blank left in this section of the agreement represents dollar amounts to be filled in depending upon the type of work involved, e.g., drilling, well servicing or workover. In this case $50,000.00 was the maximum amount to be paid by the contractor in the event there was damage from pollution or contamination
 
 
 [17]
 The pollution control clause in the OSERS and Wireline blanket service agreements is the identical clause as that set out on page 1095 supra
 
 
 [18]
 The trial court determined that the evidence supported the following special damages:
 
 
 [1]
 Past medical expenses $ 87,709.99
2. Future medical expenses
 a) Four additional operations on
 hand by Dr. Sato ($1,500 per
 hospitalization; $1,000 surgical fee
 per operation) $ 10,000.00
 b) Future psychiatric care by Dr.
 Elinspruch ($4,000 per year for 43
 years) $ 172,000.00
3. Past loss of wages and benefits Dr.
 Seymour Goodman) $ 76,236.44
4. Future loss of wages and benefits (Dr.
 Seymour Goodman) $1,693,667.96
 -------------
 Total $2,039,614.39
 
 
 [19]
 La.Rev.Stat.Ann. Sec. 4203. Interest on judgments from judicial demand in ex delicto cases
 Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, "ex delicto", which may be rendered by any of the courts.
 
 
 [20]
 In Berry and Aymond we upheld a denial of prejudgment interest determining that 28 U.S.C. Sec. 1961 is a positive statement of federal law and as such was controlling in an action brought under the OCSLA