Lisa HUGHES and Larry
Hughes, Plaintiffs,

v.

FORD MOTOR COMPANY, Defendant.

No. CIV.A. 1:99CV332–D–D.

United States District Court,
N.D. Mississippi,
Eastern Division.

May 24, 2002.

Rhett R. Russell, Joe Blair Timmons, Attorney, Tupelo, MS; William C. Walker, Jr., Attorney, Oxford, MS, for plaintiffs.

Bradley Witherspoon Smith, Barry Ford, Baker, Donelson, Bearman & Caldwell, Jackson, MS, for defendant.

*OPINION GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE, NEW TRIAL OR REMITTITUR*

DAVIDSON, Chief Judge.

Presently before the court is the Defendant's renewed motion for judgment as a

matter of law pursuant to Rule 50 of the *Federal Rules of Civil Procedure* or, in the alternative, for a new trial or remittitur of judgment. Upon due consideration, the court finds that the motion for judgment as a matter of law and new trial shall be denied and that the motion for remittitur shall be granted.

## A. Factual and Procedural Background

Lisa and Larry Hughes (Hughes) brought this products liability action pursuant to Miss.Code § 11–1–63. They contend that the 1991 Ford Explorer that Lisa Hughes was driving on October 4, 1998, was defectively designed. They argue that Ford Motor Company's (Ford) design allowed leaves to accumulate in the blower box of the vehicle's ventilation system where they could catch fire. Lisa Hughes was injured by such a fire and suffered significant burns.

This cause came on for trial on February 4, 2002, and continued through February 7, 2002. At the conclusion of the Hughes' proof, Ford moved for judgment as a matter of law. This court overruled Ford's motion. At the close of Ford's defense, Ford renewed their motion and this court again overruled it. The jury returned a verdict in favor of Lisa Hughes and against Ford in the amount of $4,000,000 in compensatory damages.

Ford argues that the Hughes failed to introduce sufficient evidence to establish their claim. As such, there was no evidence to support the jury's verdict or, alternatively, the verdict was contrary to the great weight of the evidence. Ford contends, therefore, that they are entitled to judgment as a matter of law or, in the alternative, to a new trial or remittitur.

## B. Motion for Judgment as a Matter of Law

### 1. Standard

Rule 50(a)(1) of the *Federal Rules of Civil Procedure* sets forth the standard for granting judgment as a matter of law:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Fed.R.Civ.P. 50(a)(1).

In applying this standard, the court must consider all of the evidence in the light most favorable to the nonmovant, drawing all reasonable factual inferences in that party's favor, and leaving credibility determinations and the weighing of evidence to the jury. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149–50, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000); *Giles v. General Electric Co.*, 245 F.3d 474, 481 (5th Cir.2001); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir.2000); *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (overruled on other grounds by *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir.1997)). The court should grant a motion for judgment as a matter of law only when "the facts and inferences point so strongly and overwhelmingly in favor of [the moving] party that the court believes that reasonable [jurors] could not arrive at a contrary verdict." *Boeing Co.*, 411 F.2d at 374.

### 2. *Mississippi Code § 11–1–63*

Mississippi Code § 11–1–63 provides in relevant part that:

In any action for damages caused by a product except for commercial damage to the product itself:

(a) The manufacturer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:

(i) 1. The product was defective because it deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, or

2. The product was defective because it failed to contain adequate warnings or instructions, or

3. The product was designed in a defective manner, or

. . . . .

(f) In any action alleging that a product is defective because of its design pursuant to paragraph (a)(i)3 of this section, the manufacturer or product seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:

(i) The manufacturer or seller knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger that caused the damage for which recovery is sought; and

(ii) The product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, prac-

ticality or desirability of the product to users or consumers.

Miss.Code. § 11–1–63 (2002).

### 3. *Discussion*

At the trial of this matter, the Hughes failed to call their two designated design experts, Thomas J. Feaheny and Richard E. Forbes. Instead, they called Ford Design Analysis Engineer Chuck Adams (Adams) as an adverse witness. Ford argues that by relying solely on Adams' testimony, the Hughes failed to establish the statutory requirements that (1) the 1991 Ford Explorer was unreasonably dangerous to the user consumer and that (2) in 1990, the time that the 1991 Ford Explorer was manufactured and sold, Ford knew or should have known, that the design of the vehicle's air handling system presented the danger of fire to drivers and passengers.

In support of their argument, Ford relies on the testimony given by Adams while on direct examination after being called as an adverse witness by Walker, the Hughes' attorney.

Q. And you knew back at the time that you manufactured this vehicle, that there was a danger of accumulating leaves next to this resistor; correct?

A. A danger? I'm sorry. Give me something a little more definitive than just danger.

Q. Well, risk?

A. I don't know that I would describe it as a risk.

Q. Did you know with the holes as big as they are, that things could get in around the holes?

A. Yes.

Q. Did you know that down in the resistor, there was an exposed electrical coil?

A. There is in virtually every automobile.

Q. Yes sir. But you knew it?

A. Yes, sir.

Q. That's the point I'm trying to say.

A. Yes, sir.

Q. And you knew it at the time you sold the product?

A. We've used that resistor since 1960. Yes, we're familiar with it.

Trial Transcript, page 183, lines 5–24.

This testimony, Ford argues, simply establishes that Ford was aware in 1990 that it was possible for foreign materials to penetrate the openings in the crowl grill and that the resistors within the air handling system had exposed electrical coils. Further, they argue that Adams' testimony on direct examination by Ford's attorney, Jones, establishes that Ford had no knowledge of the danger of fire.

Q. Okay. Given your capacity at Ford in 1990, as a design analysis engineer and given your experience with Ford since 1990, do you know whether or not Ford, at the time that it sold this vehicle, had any reason to believe or had any knowledge that the design of this vehicle was in any way dangerous in the respects that we're talking about in this case, via-á-vis consumer?

A. No, there was no knowledge of any kind of danger.

Q. All right. Was there information that you are aware of that would put you on notice of any danger to the consumer from the design of this vehicle—

A. No, sir.

Q. in 1990?

A. Correct. No, none.

Q. In 1999— I mean 1990, when this '91 Ford Explorer left the control of Ford, did Ford have reason to believe that the design of this vehicle, alleged to have caused the plaintiff's damage in the case, was unreasonably dangerous to consumers such as Ms. Hughes?

A. No.

Trial Transcript, page 437, lines 7–25 and page 438, line 1.

Q. ... In 1990, when you were at Ford as a design analysis engineer, did you, or the people at Ford, believe that this design could cause a fire that would be dangerous to the consumer?

A. No, sir.

Q. Did you have, you being Ford, have on hand, knowledge in your opinions that told you there was going to be a fire in this vehicle?

A. No, sir.

Q. That's 1990?

A. 1990. No, sir.

Q. And that was the first year for Ford Explorer; right?

A. Well, the 1991 build began around September first or around August first of 1990.

Q. Did you, at Ford, in 1990, believe that this design presented an unreasonable danger to the consuming public in the United States or anywhere else?

A. No, sir.

Trial Transcript, page 479, lines 3–21.

In support of their motion, Ford argues that the case of *Dye v. Ford Motor Company,* 2000 WL 877005 (N.D.Miss.) is analogous to the case *sub judice.* This court does not agree.

In *Dye,* this court granted the defendant's motion for summary judgment, finding that the plaintiffs had failed to establish an element of their claim under § 11–

1-63. The court noted that the plaintiffs had failed to present evidence establishing that a genuine issue of material fact existed as to whether Ford knew the vehicle was defective at the time it left their control. *Dye,* 2000 WL 877005 at *2. In the *Dye* case, however, while the plaintiffs' expert witnesses opined that the truck was the cause of the fire, they did not express an opinion as to how the truck was defective, nor did they allege that the truck failed to meet Ford's specifications. *Id.* Alternatively, they appeared to rely on the doctrine of *res ipsa loquitur* to establish this element of their claim. That is not the situation in the case *sub judice.* The Hughes have clearly indicated how they believed the Explorer's ventilation system was defective and offered expert testimony at trial that the fire started in the blower box. Accordingly, the court finds that the *Dye* case is distinguishable and inapplicable.

The Hughes, on the other hand, argue that they introduced sufficient evidence to establish that Ford knew in 1990, or should have known, that there was a danger that leaves collecting in the blower box would cause a fire. In support of their argument, they rely on Adams' testimony while he was on cross examination by Walker:

Q. So you knew back in 1990 that you needed to do something-- Ford reasonably knew that you needed to do something to keep stuff, foreign material from getting down into this box; correct?

A. All auto manufacturers know that, yes.

Q. And you knew it in 1990?

A. Sure.

Q. Okay. And you didn't want stuff to get down in this box, so you put holes in there; right?

A. No, we put holes in there to get air.

Q. You put a grid in there to keep things from getting in there; correct?

A. To prevent large material from coming in, yes.

Trial Transcript, page 440, lines 4-16.

Q. You don't want leaves to come through these holes?

A. No.

Q. And get in the air system and get down in there, do you?

A. That's correct.

Q. And you didn't in 1990?

A. We didn't.

Trial Transcript, page 441, lines 18-25.

Q. Well, you all knew back in 1990 as a design engineer that this resister *[sic]* would glow and create heat, didn't you?

A. I don't think I would view it as glowing.

Q. Excuse me.

A. It does create heat.

Q. (Nods head up and down.)

A. It does create a small amount of heat, but it's not like a toaster element, no.

Q. And you knew that it created enough heat or could reasonably have told it could create enough heat to burn your finger if you stuck it on there; correct?

Trial Transcript, page 442, lines 14-25.

A. A lot of things-- 140 degrees is kind of the threshold for burning skin temperature. There are a lot of things in cars that can exceed 140 degrees.

Q. I'm getting back to 1990. You knew this thing could burn, didn't you, could burn something?

A. If you put your finger on it, it could burn it.

Q. You knew, though— — or anybody, an engineer would know that if you put dry leaves next to this thing, that it could cause it to singe; correct?

A. Correct.

Q. And it could cause it to smoke; correct?

Trial Transcript, page 443, lines 1–6, 21–25.

A. Yes.

Q. And it might possibly cause it to burn?

A. It's possible that it could cause material in immediate contact with it to burn, yes.

Q. And you knew that back in 1990? It doesn't take a rocket scientist to know it. Excuse me. That was a double question. You knew it back in 1990? Ford did?

A. Yes.

Trial Transcript, page 444, page 1–8.

■ Drawing all reasonable factual inferences in the Hughes' favor, the court is of the opinion that reasonable jurors could find in favor of the Hughes. Adams, who notably was called as an adverse witness, testified that in 1990 Ford knew that leaves could collect in the blower box and that those leaves could come in contact with a resistor and cause smoke. It is, therefore, not unreasonable to find that they could also cause a fire.

The Fifth Circuit was faced with a similar situation in the matter of *Lowe v. General Motors Corp.*, 624 F.2d 1373 (5th Cir. 1980). In *Lowe,* evidence showed that General Motors was aware that some of its owners faced a risk of partial loss of steering control due to a stone lodging between a coupling and the frame. They had conducted experiments and tests, but were unable to get a stone to lodge in the steering coupling, unless it was placed there by hand. General Motors, therefore, argued that they could not possibly have known of the risk and had no duty to warn of the danger of total loss of steering. But, the Fifth Circuit ruled that it was a jury question because "the risk of partial loss of steering due to a stone lodged between the coupling and the frame and the risk of total loss of steering due to a stone lodged within the steering coupling are quite similar dangers." *Lowe,* 624 F.2d at 1382. They stated that "it was not unreasonable to infer that if GM knew of the one risk, they might have known of the other. Thus, the jury's conclusion that the warning was inadequate is not unreasonable." *Id.*

This court finds the *Lowe* case to be analogous to the case *sub judice* notwithstanding the fact that *Lowe* concerned the issue of warning. Both cases deal with the knowledge that the manufacturer had, or should have had, in light of available information and the exercise of reasonable care. Accordingly the court finds that it is not unreasonable to infer that if Ford knew in 1990 that there was a danger of smoke, they should have known of a danger of fire.

■ Further, the court notes that Adams made conflicting statements during his testimony concerning Ford's knowledge in 1990, depending on whether he was testifying on direct for Ford or as an adverse witness or on cross by the Hughes. The court also finds that this creates a jury question. In the case of *Hale v. Firestone Tire & Rubber Co.,* 756 F.2d 1322 (8th Cir.1985), the Eighth Circuit held that when a witness makes conflicting statements concerning his knowledge of a product's defect, the extent of his knowledge is a jury question.

In light of *Lowe* and *Firestone,* the court is of the opinion that considering all of the evidence in the light most favorable to the

Hughes and drawing all reasonable factual inferences in their favor, the Hughes met their burden of proof on the issue of Ford's knowledge in 1990 and on the issue of whether the Explorer was unreasonably dangerous. *See Reeves,* 530 U.S. at 149–50, 120 S.Ct. at 2110, 147 L.Ed.2d 105; *Giles,* 245 F.3d at 481; *Russell,* 235 F.3d at 222; *Boeing,* 411 F.2d at 374–75. This case was properly submitted to the jury. Accordingly, Ford's motion for judgment as a matter of law shall be denied.

### C. Motion for New Trial

Rule 59 of the *Federal Rules of Civil Procedure* permits a trial court to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict. The rule does not specify what grounds are necessary to support such a decision, but states only that the action may be taken "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R.Civ.P. 59(a); *Smith v. Transworld Drilling Co.,* 773 F.2d 610, 613 (5th Cir.1985). A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course. *See, e.g., Eyre v. McDonough Power Equip., Inc.,* 755 F.2d 416, 420–21 (5th Cir.1985); *Conway v. Chemical Leaman Tank Lines, Inc.,* 610 F.2d 360, 363 (5th Cir.1980); *Westbrook v. General Tire and Rubber Co.,* 754 F.2d 1233, 1241 (5th Cir.1985); *Carson v. Polley,* 689 F.2d 562, 570–71 (5th Cir.1982); *Martinez v. Food City, Inc.,* 658 F.2d 369, 372–74 (5th Cir.1981); *Hand v. United States,* 441 F.2d 529, 531 (5th Cir.1971); *Reed Bros., Inc. v. Monsanto Co.,* 525 F.2d 486, 499–500 (8th Cir.1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 645 (1976).

Ford argues that they are entitled to a new trial of this matter due to the Hughes' failure to introduce sufficient evidence to establish a claim for design defect under Miss.Code § 11–1–63. In light of the foregoing opinion regarding Ford's motion for judgment as a matter of law, the court does not agree. The court finds that sufficient evidence was introduced at the trial of this matter to create a jury question. The verdict was not against the weight of the evidence. Accordingly, the court finds that Ford's argument fails and their motion for a new trial shall be denied.

### D. Motion for Remittitur

There is a strong presumption in favor of affirming a jury award of damages. The damage award may be overturned only upon a clear showing of excessiveness or upon a showing that the jury was influenced by passion or prejudice. *Westbrook v. General Tire and Rubber Co.,* 754 F.2d 1233, 1241 (5th Cir.1985). The decision to grant or deny a motion for remittitur rests in the sound discretion of the trial judge. *Westbrook,* 754 F.2d at 1241.

A verdict is excessive if it is "contrary to right reason" or "entirely disproportionate to the injury sustained." *Caldarera v. Eastern Airlines, Inc.,* 705 F.2d 778, 784 (5th Cir.1983). While pain and suffering is not easily susceptible to monetary quantification, and the jury has broad leeway, the sky is simply not the limit for jury verdicts. *Simeon v. T. Smith & Son, Inc.,* 852 F.2d 1421, 1427 (5th Cir.1988).

Lisa Hughes was 31 years old at the time of her accident. She sustained approximately 20 percent total body service area burns and also sustained a fracture to her spine. She had burns to half of her back, her right forearm and hand and left arm and hand. She also suffered burns to her left leg and right knee.

Hughes no doubt experienced intense pain during her accident, 47 day hospital stay, three resulting surgeries and rehabilitation therapy. She was left with a lifetime of disfigurement and incurred approximately $376,000.00 in medical bills. However, she was eventually able to return to her daily activities with little or no disability. After a review of the record, this court finds that the $4,000,000 verdict was excessive.

In most cases, the court must determine the size of the remittitur in accordance with this circuit's "maximum recovery rule" by reducing the verdict to the maximum amount the jury could properly have awarded. *Dixon v. International Harvester Co.*, 754 F.2d 573, 590 (5th Cir.1985). "[W]e apply the loosely defined 'maximum recovery rule' when deciding whether a remittitur is in order. This judge-made rule essentially provides that we will decline to reduce damages where the amount awarded is not disproportionate to at least one factually similar case from the relevant jurisdiction." *Lebron v. U.S.*, 279 F.3d 321, 326 (5th Cir.2002) (citing *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1344 (5th Cir.1990)). The rule "does not necessarily limit an award to the highest amount previously recognized in the state;" indeed, the rule "does not become operative unless the award exceeds 133% of the highest previous recovery in the [relevant jurisdiction]" for a factually similar case. *Lebron*, 279 F.3d at 326. Because the facts of each case are different, prior damages awards are not always controlling; a departure from prior awards is merited "if unique facts are present that are not reflected within the controlling caselaw." *Id.; See Wheat v. United States*, 860 F.2d 1256, 1260 (5th Cir.1988); *Wakefield v. United States*, 765 F.2d 55, 59–60 (5th Cir.1985).

The leading factually similar case in the Fifth Circuit is *Eiland v. Westinghouse Electric Corp.*, 58 F.3d 176 (5th Cir.1995).

In *Eiland*, the jury awarded $5,000,000 and the Fifth Circuit reduced it to $3,000,000. Thus, the Hughes' award is exactly 133% of the *Eiland* award. Accordingly, the court finds that the maximum recovery rule does not apply to this matter. However, the court also finds that a mainstay of the excessiveness determination is still a comparison of awards resulting from similar injuries. *See Dixon*, 754 F.2d at 589. This comparison is limited to cases in the "relevant jurisdiction." *Salinas v. O'Neill*, 286 F.3d 827 (5th Cir.2002) (citing *Douglass*, 897 F.2d at 1339). As this case involves Mississippi's product liability law, this court will consider both Fifth Circuit and Mississippi Supreme Court cases.

Once again, the court finds the *Eiland* case is the most analogous. In *Eiland*, a lineman brought a products liability action against the manufacturer of a high-power circuit breaker that exploded and severely burned his face, hands, arms and torso. *Eiland*, 58 F.3d at 179. Eiland required five weeks of in-patient hospital care and several additional weeks of out-patient care, which included painful debridement procedures and various surgeries. He returned to work full time after 21 months although he remained 30 to 40 percent disabled. Eiland's lost earnings prior to trial were $30,081.00 and his past medical expenses were $172,744.00. *Id.* The jury returned a verdict for $5,000,000 dollars in compensatory damages. The Fifth Circuit, finding that the $5,000,000 was excessive, reduced Eiland's recovery to $3,000,000. *Id.* at 183.

In *Smith v. Shell Oil Co., et al.*, 746 F.2d 1087 (5th Cir.1984), the Fifth Circuit affirmed an award of $600,000 to the plaintiff for injuries suffered in an offshore oil platform accident. Smith was burned in a gas fire and suffered second and third degree burns over 90 percent of his body. He

was in intensive care for 54 days, received treatment for kidney problems and burn therapy. He also underwent several surgeries and was expected to suffer from chronic itching and the inability to sweat for the remainder of his life. The jury awarded Smith $3,000,000 of which the trial court determined $1,000,000 was for pain and suffering and the remainder for past and future medicals and past and future lost wages. *Smith*, 746 F.2d at 1096. The trial court then reduced the $1,000,000 to $600,000. The Fifth Circuit affirmed. *Id.*

In another Fifth Circuit case, *Sosa v. M/V Lago Izabal*, 736 F.2d 1028 (5th Cir. 1984), the court remanded a jury award of $10,000,000 for pain and suffering. Sosa was burned over 80 percent of his body when the engine of a ship exploded. His sweat glands, hair follicles and most of his nerve endings were destroyed. His hands were fixed in a claw position and he required a nurse to assist him in most daily tasks and hygienic functions. *Sosa*, 736 F.2d at 1035. The court stated that they believed that an award of $1,000,000 approached the maximum amount which a jury could award, but nevertheless, chose not to enter a remittitur and allowed the trial judge to reconsider his award. *Id.*

In *Stubblefield v. Jesco, Inc.*, 464 So.2d 47 (Miss.1984), the Mississippi Supreme Court upheld a jury award of $1,200,000 in a personal injury case. Stubblefield was injured as a result of an explosion and fire at a mill. He was burned on up to 60 percent of his body, including his face, neck, arms, chest, back and legs and he remained in the hospital approximately 300 days. Stubblefield lost all ability for sexual performance and the ability to dispose of bodily waste in a normal fashion. His medical bills prior to trial totaled $126,690.30. *Stubblefield*, 464 So.2d at 51.

There is no question that Lisa Hughes incurred some $376,000 in medical bills. It is also obvious to the court that she will have permanent scarring on over 20 percent of her body and experience discomfort during times of extreme temperatures. However, taking the foregoing cases into consideration, along with the relevant time periods in which they were decided, the court finds that an award of $4,000,000 is excessive. Again, the *Eiland* case is persuasive. Eiland and Lisa Hughes both have similar injuries. They both spent a similar amount of time in the hospital and underwent similar treatments. Eiland, however, suffered lost wages which Lisa Hughes is not claiming. Eiland also had a 30 to 40 percent disability. On the other hand, Lisa Hughes incurred over $200,000 more in medical bills than Eiland did, a fact which could be contributed to the passage of time between the *Eiland* decision and the present.

Accordingly, the court shall grant Ford's motion for remittitur and shall reduce the award of compensatory damages from $4,000,000 to $2,500,000. The Hughes may accept or refuse the remittitur. *See Deffenbaugh–Williams v. Wal–Mart Stores, Inc.*, 156 F.3d 581, 596 (5th Cir.1998). If the Hughes refuse the remittitur, the court shall grant Ford a new trial solely on the issue of compensatory damages.

### E. Conclusion

The court finds that the Hughes met their burden of proof through Adams' testimony as an adverse witness and on cross-examination. Ford's motion for judgment as a matter of law shall be denied. Ford's motion for a new trial based on the Hughes' failure to submit evidence sufficient to create a jury question shall be likewise denied. Ford's motion for remittitur shall be granted and the jury verdict of $4,000,000 shall be reduced to $2,500,000. If the Hughes refuse the remittitur, the court shall grant Ford a new

trial solely on the issue of compensatory damages.

A separate order shall issue this day in accordance with this opinion.